UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NEW WORLD SOLUTIONS, INC.,

                    Plaintiff,

    -v-

NAMEMEDIA INC., et al.,

                    Defendants.

Case No.11-CV-2763 (KMK)

OPINION AND ORDER

---

Appearances:

Ronald S. Kossar, Esq.
Law Office of Ronald S. Kossar
Middletown, NY
*Counsel for Plaintiff*

Martin Bernard Schwimmer, Esq.
Cameron Sean Reuber, Esq.
Jonathan Webster Thomas, Esq.
Leason Ellis LLP
White Plains, NY
*Counsel for Defendant NameMedia, Inc.*

KENNETH M. KARAS, District Judge:

       Plaintiff New World Solutions, Inc. ("NWS" or "Plaintiff") brings this Action against

Defendant NameMedia, Inc. ("NameMedia" or "Defendant").[1]  NWS alleges that NameMedia's

---

[1] NWS also filed the Action against "ABC Entities 1–10," (also referred to as "ABC Companies 1–10"), defined as "fictitious names for business entities whose identities have not yet been determined who directly and/or through their agents, employees[,] and/or officers participated in, aided, abetted, supervised, permitted, allowed, directed[,] and/or condoned the acts and/or omissions complained of herein," (First. Am. Compl. ¶ 5 (Dkt. No. 23)), and "John Does 1–10," who represent "individuals whose identities are presently unknown who aided in, abetted, participated in, conspired to commit, facilitated, abetted[,] or were otherwise liable for

registration of and activities associated with the domain name "www.newworldsolutions.com" (the "Domain Name"), constitute trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c), cybersquatting in violation of the Lanham Act, 15 U.S.C. § 1125(d), deceptive acts and false advertizing in violation of the New York General Business Law, ("NYGBL") §§ 349–50, and dilution under NYGBL § 360-l.  (First Am. Compl. ("FAC") ¶¶ 22–44 (Dkt. No. 23).) NameMedia asserts counterclaims under the Lanham Act for a declaratory judgment that U.S. Service Mark Registration No. 3,919,493 (the "Mark Registration") of the Mark "New World Solutions" (the "Mark") is invalid and unenforceable pursuant to 15 U.S.C. § 1119, a declaratory judgment under 15 U.S.C. § 1120 that NWS is liable to NameMedia for all damages incurred by NameMedia as a result of NWS's attempts to enforce its registration of the Mark, and attorneys' fees pursuant to 15 U.S.C. § 1117(a).  (Def.'s Answer and Counterclaims to First Am. Compl. ("Def.'s Counterclaims") ¶¶ 7–30 and Prayer for Relief (Dkt. No. 25).)

The Parties have filed Cross Motions for Summary Judgment.  (See Dkt. Nos. 68, 76.) Specifically, NameMedia moves for summary judgment on all of Plaintiff's claims and Defendant's counterclaims and NWS moves for summary judgment as to NameMedia's counterclaims.  In addition, the Parties have filed Cross Motions To Strike Evidence.  (See Dkt. Nos. 87, 94.)  For the reasons stated herein, NameMedia's Motion To Strike is granted in part and denied in part, NWS's Motion to Strike is granted in part and denied in part, NameMedia's Motion for Summary Judgment is granted with respect to NWS's claims and denied with respect to NameMedia's counterclaims, NWS's Motion for Summary Judgment is denied, and

_____

the actions complained of herein," (id. ¶ 6).  The papers for the instant Motions do not address or otherwise mention these sets of Defendants.

NameMedia's request declaring this case "exceptional" pursuant to the Lanham Act 15 U.S.C. § 1117 is denied.

I. Background

A. Facts

    1. The Parties

    In this Action, NWS describes itself as a "staffing company" whose employees "[t]ypically" provide technology consulting services. (Videotaped Examination of David Shaun Neal ("Neal Tr.") 21–22.)[2]  Those services "include technology consulting, technology outsourcing, telephon[e] consulting, network support, network monitoring, mobile application development and many other technology related services." (Decl. of Martin B. Schwimmer, Esq. in Supp. of Def.'s Mot. for Summ. J. ("Schwimmer Decl. I") Ex. 7 ("Pl.'s Resps. to Def.'s First Set of Interrogs.") No. 12 (Dkt. No. 69).)[3]  NWS asserts that it "has advertised and publicized" the Mark for "over 8 years and in 4 countries," currently "provides services to 15 companies," "has done business with over 50 companies under the [M]ark [since July of 2004]," and has "offered its services under the [M]ark to hundreds of thousands of companies since 2004." (*Id.* at Nos. 10, 12.)  Together with its wholly-owned subsidiaries, NWS allegedly employs over 100 people, (FAC ¶ 9), and, since 2007, has generated "about a million and a half to [two] million a

---

    [2] The full deposition transcript of Shaun Neal, NWS's principal, can be found attached to the December 8, 2015 Letter from Cameron S. Reuber, Esq., to the Court. (Dkt. No. 113.)  The transcript is also excerpted in several locations. (*See* Decl. of Schwimmer at Ex. 5 (Dkt. No. 69); Decl. of Zilinek at Ex. J (Dkt. No. 70); Decl. of Kossar at Ex. 3 (Dkt. No. 77); Decl. of Schwimmer at Ex. E (Dkt. No. 88).)

    [3] Shaun Neal has also testified that there is no "limitation" on the kind of services provided to clients by NWS employees, and that services could include, among other things, "administrative" services. (Neal Tr. 22.)

3

year" in revenue, (Neal Tr. 147).  Plaintiff allegedly "maintains a website, regularly engages in direct mail marketing and retains a full time sales staff which regularly solicits business for clients in several US states and worldwide."  (FAC ¶ 8.)[4]  NWS asserts that, "[i]t is widely known and recognized in the industry."  (Pl.'s Resps. to Def.'s First Set of Interrogs. No. 10.)

In the First Amended Complaint, Plaintiff alleges that it is a Wyoming Corporation that "provides business services to large, multinational corporations worldwide and has done so since June of 2004."  (FAC ¶¶ 3, 7.)  It is undisputed, however, that "[t]here is no documentary evidence in the record that any purported predecessor-in-interest to Plaintiff existed prior to 2007."  (Def.'s Rule 56.1 Statement of Material Facts Not in Dispute in Supp. of Its Mot. for Summ. J. ("Def.'s 56.1") ¶ 29 (Dkt. No. 71); Pl.'s Resp. to Def.'s Statement of Material Facts Not in Dispute and Pl.'s Statement of Material Facts Not in Dispute in Supp. of Pl.'s Cross-Mot. for Summ. J. Pursuant to Local Rule 56.1 ("Pl.'s 56.1") ¶ 29 (Dkt. No. 80); *see also* Schwimmer Decl. I ¶ 23.)  A Certificate of Incorporation from the Office of the Secretary of State of Wyoming identifies that on May 25, 2010, a "New World Solutions, Inc." was incorporated in Wyoming (the "2010 Wyoming Entity"); Shaun Neal ("Neal"), NWS's principal, testified that NWS was also registered in Delaware in 2007 (the "2007 Delaware Entity"); a nunc for tunc document dated November 24, 2008 states that a "New World Solutions,  Inc." was incorporated under the laws of the State of Delaware on March 26, 2007; and Neal identifies himself and Robert Coyne ("Coyne") as having been the co-owners of both the 2007 Delaware Entity and the 2010 Wyoming Entity, until the Fall of 2012, when Neal became the sole owner of the Wyoming Entity.  (Def.'s 56.1 ¶¶ 29–33; Pl.'s 56.1 ¶¶ 29–33; *see also* Schwimmer Decl. I Exs. 11–12.)

_____

[4] NWS owns the domain names "nwsol.com," "newworldsupport.com," and "nwspartners.com," which were purchased "between August 2, 2007 and September 26, 2011."

Defendant contends that "[t]here is no evidence identifying ownership of either the 2007 Delaware Entity or the 2010 Wyoming Entity, or that any assets were transferred from the 2004 'd/b/a/' to the 2007 Delaware Entity, or from the 2007 Delaware Entity to the 2010 Wyoming Entity." (Def.'s 56.1 ¶ 35.) Plaintiff disputes this. (Pl.'s 56.1 ¶ 35.) Plaintiff's account of its history and activities—which is strongly contested by Defendant—proceeds as follows: beginning in 2004, a "d/b/a" run jointly by Neal and Coyne (the "d/b/a entity") "performed . . . services" using the name "New World Solutions." (*See* Neal Tr. 27–28; *see also* Decl. of David Shaun Neal in Supp. of Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. and in Supp. of Pl.'s Mem. of Law for Summ. J. ("Neal Decl.") ¶ 40 (Dkt. No. 79) (stating that between 2004 and the date of his declaration, Neal was employed full time at NWS).) Coyne and Neal split the revenues from the d/b/a entity. (Neal Tr. 91.) Although Coyne claims that his "business activities with . . . Neal commenced in early 2004 and continued until late 2012, [when he] transferred all of [his] interest in [NWS] to . . . Neal," he cites to nothing in the record to support this assertion, and in particular that he had business activities with Neal in 2004. (Decl. of Robert F. Coyne in Supp. of Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. and in Supp. of Pl.'s Mem. of Law for Summ. J. ("Coyne Decl. I") ¶ 10 (Dkt. No. 78).)

NWS has no documentary evidence that establishes the existence of the d/b/a entity, or its promotional activities, services, or revenues, allegedly because Neal had a "simultaneous failure of the primary and the secondary hard drive" on his computer in 2007 and because Plaintiff was unable to locate any documents relating to the d/b/a entity or its activities by any other means. (*See* Neal Tr. 28–29, 32, 37–38, 143–45, 147–49, 159.) However, Neal testified that the d/b/a entity engaged in marketing activities, which consisted of (1) "one-on-one sales techniques,"

_____

(Pl.'s Resp. to Def.'s First Set of Interrogs. No. 16.)

which means that Coyne and Neal "cold call[ed]" and e-mailed potential clients, and (2) sending promotional postcards to a mailing list obtained from a company called American Business Lists. (*Id.* at 31–32.)  Neal also testified that he recalled three clients of the d/b/a entity in 2004, namely "Merrill Lynch . . . a real estate company in Arizona . . . [and] an institutional foreign exchange trader."  (*Id.* at 36–37.)  Moreover, although Neal stated in his deposition that NWS's revenue figures were "a few hundred thousand" in 2004, "over a million," in 2005–06, and "about a million and a half to 2 million a year" in 2007–12, Neal has testified that he does not have any documents to support NWS's revenue for 2004–07 because "they were on the crash on the hard drive."  (Def.'s 56.1 ¶¶ 57–58; Neal Tr. 147–48.)

The "original legal entity" for NWS was created on March 26, 2007, when Coyne allegedly incorporated New World Solutions, Inc. as a Delaware C Corporation.  (Neal Tr. 27; *see also* Schwimmer Decl. I Ex. 11; Coyne Decl. I ¶ 3; *id.* at Ex. 1.)  Coyne dissolved the 2007 Delaware Entity on July 12, 2010 and transferred all of its assets and liabilities, including all of the rights to the trade name New World Solutions, to the 2010 Wyoming Entity, which was formed on May 25, 2010.  (Coyne Decl. I ¶¶ 5, 7–9; *id.* at Exs. 2–3.)  Coyne and Neal each owned 50% of the Delaware and Wyoming entities, but on December 6, 2012, Coyne transferred to Neal the entirety of his interest in NWS so that, at present, Neal is the "managing partner" and "sole shareholder" of NWS.  (Neal Decl. ¶¶ 1–2; Coyne Decl. I ¶¶ 4, 6, 10.)  Coyne does not cite to anything in the record to support this transfer.  Neal states that he "determined that [he] possess[es] evidence of ownership of New World Solutions, Inc[.] (DE), New World Solutions, Inc[.] (WY)[,] and the transfers of ownership between [himself] and . . . Coyne which occurred during the relevant time of this [A]ction."  (Neal Decl. ¶ 41.)  Neal also states that he "testified that . . . Coyne possesses th[e]se records, however [he does] not believe that any request was

made by [D]efendant to . . . Coyne for any records."  (*Id.* ¶ 41.)  In other words, there yet again are no documents that support Coyne's or Neal's statements.

NameMedia is a Delaware Corporation with headquarters in Waltham, Massachusetts. (FAC ¶ 4.)  NameMedia offers a marketplace for purchase and sale of domain names by and for others and also purchases and sells domain names for its own accounts.  (Def.'s 56.1 ¶ 72; Pl.'s 56.1 ¶ 72; Schwimmer Decl. I ¶ 42; Decl. of Erik S. Zilinek, Esq. in Supp. of Def.'s Mot. for Summ. J. ("Zilinek Decl. I") ¶ 5 (Dkt. No. 70).)  Although NameMedia states that its "policy is to register and maintain only those domain names that incorporate common words or phrases, descriptive terms, and/or words to which NameMedia considers no single party has exclusive rights, if any," (Def.'s 56.1 ¶ 73; Zilinek Decl. I ¶ 3), Plaintiff disputes this, noting that despite its requests, Defendant provided no evidence of this policy, (Pl.'s 56.1 ¶ 73).  NameMedia "monetizes" some of its domain names by displaying Google AdWords and advertisements, links to Google ads on a holding page, and solicitations for offers to purchase its domain names. (Def.'s 56.1 ¶ 74; Pl.'s 56.1 ¶ 74; Zilinek Decl. I ¶ 6; Schwimmer Decl. I ¶ 43.)   NameMedia's website states: "We start with our inventory of more than 900,000 domains—the single largest portfolio of domain names for sale."  (Pl.'s 56.1 ¶ 81; Def.'s Rule 56.1(B) Counter Statement to Pl.'s Rule 56.1(A) Statement of Material Facts Not in Dispute in Supp. of Pl.'s Cross-Mot. for Summ. J. ("Def.'s Reply 56.1") ¶ 81 (Dkt. No. 92); Neal Decl. ¶ 44; *id.* at Ex. 19.)

According to Defendant it "uses a method known as 'robot exclusion' to prevent indexing of its holding pages by search engines."  (Def.'s 56.1 ¶¶ 9, 75; Zilinek Decl. I ¶ 4.) Plaintiff disputes this and claims, instead, that Defendant encourages search engines to crawl its sites.  (Pl.'s 56.1 ¶¶ 9, 75, 80; Neal Decl. ¶¶ 7–11.)  Defendant, in turn, claims that it would be cost prohibitive for NameMedia to crawl for keywords in the manner and for the purpose that

Plaintiff alleges and would put it out of business.  (Def.'s Reply 56.1 ¶ 80.)  Plaintiff further points out that there is no evidence in the record to establish that Defendant conducts any bona fide business in the name of New World Solutions or in the name of the approximately 1,000,000 other names for which it has registered domains.  (Pl.'s 56.1 ¶¶ 77–78; Decl. of Ronald S. Kossar in Supp. of Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. and in Supp. of Pl.'s Mem. of Law For Summ. J. ("Kossar Decl.") ¶¶ 11–12 (Dkt. No. 77).)  Defendant disputes this, stating that NameMedia "is in the business of acquiring, developing[,] and marketing Internet domain names," and "offers a marketplace for purchase and sale of domain names by and for others." (Def.'s Reply 56.1 ¶¶ 77–78.)

## 2. The Domain Name

On March 26, 2005, NameMedia registered the Domain Name.  (Def.'s 56.1 ¶ 7; Pl.'s 56.1 ¶ 7; Schwimmer Decl. I ¶ 3; *id.* at Ex. 1.)  When NameMedia registered the Domain Name, it was unaware of NWS, (Def.'s 56.1 ¶ 8; Pl.'s 56.1 ¶ 8; Zilinek Decl. I ¶ 9), and indeed it is undisputed that the first time NameMedia learned of NWS's existence was on June 28, 2010, when Neal contacted NameMedia seeking a price quote for the Domain Name, (Def.'s 56.1 ¶ 10; Pl.'s 56.1 ¶ 10; Zilinek Decl. I ¶ 11).  NameMedia claims that "in approximately 2006, [it] searched its entire portfolio of nearly one million domain names to ensure that it had not registered domain names that infringed upon any third party's exclusive rights in or to words or phrases that were incorporated into said domain names," and that the search "did not identify any party who could assert rights in or to the NEW WORLD SOLUTIONS mark."  (Def.'s 56.1 ¶ 12; Zilinek Decl. I ¶ 9.)  Plaintiff disputes this, explaining that NameMedia "has failed to enter any evidence into the record of any such 'search' it ever performed and has failed to specify what

methodology was applied and how it determined that the mark newworldsolutions was noninfringing."  (Pl.'s 56.1 ¶ 12; Kossar Decl. ¶ 9.)

      Moreover, while NameMedia maintains that it did not register the Domain Name with the intent to disrupt NWS's business, to keep NWS from having a domain name that incorporates its purported trademark, or to confuse customers seeking to find NWS's website, (Def.'s 56.1 ¶ 11; Zilinek Decl. I ¶ 10), Plaintiff claims that NameMedia employs "optimization" of its domain names "specifically designed to divert traffic and confuse consumers," (Pl.'s 56.1 ¶ 11; Kossar Decl. ¶ 4; Neal Tr. 119–29, 325–336).  The Parties do not dispute that "[c]urrently, as well as at all times since NameMedia registered the Domain Name, the website to which the Domain Name resolves displays keyword advertisements."  (Def.'s 56.1 ¶ 12; Pl.'s 56.1 ¶ 12.)   Plaintiff also points out that while the record is devoid of any proof that Defendant provides any bona fide goods or services in relation to "Technology outsourcing," "Manila outsourcing," or "technology consulting" under the trade name New World Solutions, on June 29, 2012, the website www.newworldsolutions.com displayed those phrases.  (Pl.'s 56.1 ¶¶ 85–86; Neal Decl. ¶ 5; *id.* at Ex. 2; Kossar Decl. ¶ 11.)  Defendant does not dispute that its website contained these phrases, but does dispute that it does not offer any of those services.  (Def.'s Reply 56.1 ¶¶ 85–86.)

      Finally, Plaintiff alleges that "the sole purpose of the registration of the [D]omain [N]ame . . . is to divert traffic to the website of . . . Defendant."  (Def.'s 56.1 ¶ 24; Pl.'s 56.1 ¶ 24; FAC ¶ 16.)  Neal testified that after he "started to dig," it led him to say "oh, [Defendant has] this policy where they look at [NWS], they go to Google or Alta Vista or whatever and find the resulting websites that are top hits for [NWS], and then they go through those links and go to those websites and grab the key words off those websites and put those key words on their own websites."  (Neal Tr. 331–32.)  Defendant attempts to summarize this testimony in its 56.1

9

Statement, (Def.'s 56.1 ¶ 25), and Plaintiff objects to Defendant's characterization, stating that "[t]he testimony speaks for itself," (Pl.'s 56.1 ¶ 25).  In any event, when Neal was asked during his deposition if he had any evidence that the purpose of the registration of the Domain Name was to divert traffic to the website of Defendant, he testified that he did not and, stated that he "only suspected that there was some mechanism that was diverting the traffic or that it was optimizing key words on [NameMedia's] website based upon [NWS's] domain name."  (Neal Tr. 332, 335; Def.'s 56.1 ¶¶ 26–27; Pl.'s 56.1 ¶¶ 26–27.)

### 3.  NWS's Interaction with NameMedia

NWS first learned of NameMedia on or about June 21, 2007.  (Def.'s 56.1 ¶ 13; Pl.'s 56.1 ¶ 13; Schwimmer Decl. I ¶ 9; Pl.'s Resps. to Def.'s First Set of Interrogs. No. 3.)  On June 28, 2010, Neal contacted a NameMedia salesperson for the first time, seeking a price quote for the Domain Name.  (Def.'s 56.1 ¶ 14; Pl.'s 56.1 ¶ 14; Zilinek Decl. I ¶ 11.)  That same day, NameMedia responded by e-mail to Neal, informing him that the Domain Name was for sale at $2,588.00.  (Def.'s 56.1 ¶ 15; Pl.'s 56.1 ¶ 15; Zilinek Decl. I ¶ 12; *id.* at Ex. B.)  Neal did not respond to NameMedia's email.  (Def.'s 56.1 ¶ 16; Pl.'s 56.1 ¶ 16; Zilinek Decl. I ¶ 13.)

### 4. Registration and Use of the Mark

Approximately four hours after NameMedia e-mailed Neal its price quote for the Domain Name, Neal filed an application with the United States Patent and Trademark Office (the "USPTO") to register the Mark in the Principal Register.  (Def.'s 56.1 ¶ 16; Pl.'s 56.1 ¶ 16; Zilinek Decl. I ¶ 13; *id.* at Ex. C.)  In its June 28, 2010 Application to the USPTO, NWS described the services it provides as "[c]omputer hardware and software consulting services; [i]nformation technology consultation; [s]ervices for maintenance of computer software; [and] [s]oftware design and development," and stated that its first use of the Mark, and its first use of

the Mark in commerce, occurred "[a]t least as early as [June 21, 2007]." (Schwimmer Decl. I Ex. 18.) On July 27, 2010, Neal e-mailed NameMedia, stating that "New World Solutions, LLC" had "filed for a Trademark for" the NWS Mark, had used the Mark "in trade . . . for a number of years," and that, upon "final registration" of the Mark, NWS would bring an action against NameMedia for injunctive and declaratory relief but would "agree to settle th[e] matter out of court for $200 upon transference of the domain to [NWS]." (Def.'s 56.1 ¶ 17; Pl.'s 56.1 ¶ 17; Zilinek Decl. I ¶ 14; *id.* at Ex. D.)[5]

On February 15, 2011, the USPTO issued the Mark Registration to Plaintiff. (Def.'s 56.1 ¶ 18; Pl.'s 56.1 ¶ 18; *see also* Pl.'s Resps. to Def.'s First Set of Interrogs. No. 10; Zilinek Decl. I ¶ 15; *id.* at Ex. E.) The USPTO Registration Certificate for "New World Solutions" lists the same services as NWS's application, and lists June 21, 2007 as the date of the first use of the Mark and the date of the first use of the Mark in commerce. (Def.'s 56.1 ¶ 18; Pl.'s 56.1 ¶ 18; *see also* Zilinek Decl. I ¶ 15; *id.* at Ex. E.)

On March 18, 2011—approximately one month after the USPTO issued NWS's Registration—Coyne emailed NameMedia stating that he was counsel for Plaintiff and asserting that NameMedia's registration of the Domain Name infringed on NWS's service mark. (Def.'s 56.1 ¶ 20; Pl.'s 56.1 ¶ 20; Zilinek Decl. I ¶ 16; *id.* at Ex. F.) Coyne further stated that failure to transfer ownership of the Domain Name to NWS would result in a "civil action being brought against [NameMedia]." (Def.'s 56.1 ¶ 20; Pl.'s 56.1 ¶ 20; Zilinek Decl. I ¶ 16; *id.* at Ex. F.) On

---

[5] NameMedia construes Neal's July 27, 2010 e-mail as a demand for $200.00. (*See* Zilinek Decl. I ¶ 14.) NWS asserts it was offering to *pay* $200.00 for the Domain Name. (*See* Pl.'s 56.1 ¶ 17.) This dispute is immaterial.

March 25, 2011, Coyne emailed Erik Zilinek ("Zilinek"), Associate General Counsel for

NameMedia, stating that he was "authorized [by NWS] to proceed with legal action." (Def.'s

56.1 ¶ 21; Pl.'s 56.1 ¶ 21; Zilinek Decl. I ¶ 17; *id.* at Ex. G.) Zilinek answered by letter dated the

same day, (Def.'s 56.1 ¶ 22; Pl.'s 56.1 ¶ 22; Zilinek Decl. I ¶18; *id.* at Ex. H), to which Coyne

responded that "we will be proceeding with the aforementioned litigation," (Def.'s 56.1 ¶ 23; Pl.'s

56.1 ¶ 23; Zilinek Decl. I ¶ 19; *id.* at Ex. I).

5.  New World Solutions as a Common Name

In its 56.1 Statement, under the heading "'New World Solutions' is a Common Business

Name, Trademark, Service Mark[,] and/or Domain Name," Defendant points out that: (i) on

February 1, 1996, a New World Solutions, Inc. was incorporated in the State of New York,

(Def.'s 56.1 ¶ 59; Pl.'s 56.1 ¶ 59; Schwimmer Decl. I ¶ 8; *id.* at Ex. 6), (ii) there is a company

named New World Solutions of Fairfax, VA, which has a website at www.new-world-

solutions.com, (Def.'s 56.1 ¶ 60; Pl.'s 56.1 ¶ 60), (iii) there is a company named New World

Solutions, Inc. of Huntsville, AL, which has a website at www.newworldsol.com, (Def.'s 56.1

¶ 61; Pl.'s 56.1 ¶ 61), (iv) there is a company named New World Solutions of Smithtown, NY,

which has a website at www.newws.com, (Def.'s 56.1 ¶ 62; Pl.'s 56.1 ¶ 62), (v) there is a

company named New World Solutions of West Kill, NY, (Def.'s 56.1 ¶ 63; Pl.'s 56.1 ¶ 63), and

(vi) there is a company named New World Solutions, LLC, (Def.'s 56.1 ¶ 64; Pl.'s 56.1 ¶ 64).[6]

---

[6] Defendant provides websites for New World Solutions of West Kill, NY and New World
Solutions, LLC, (Def.'s 56.1 ¶¶ 63–64), but Plaintiff disputes the accuracy of these websites,
(Pl.'s 56.1 ¶¶ 63–64). This dispute is immaterial.

Plaintiff is not affiliated with any of these companies.  (Def.'s 56.1 ¶¶ 59–64; Pl.'s 56.1 ¶¶ 59–64.)

    B. Procedural History

On April 11, 2011, NWS filed suit against NameMedia in New York State Supreme Court, (Kossar Decl. Ex. 1), and NameMedia removed the Action to this Court on April 22, 2011, (Dkt. No. 1).  On April 3, 2012, NWS filed an Amended Complaint, asserting four claims against NameMedia:  (1) federal trademark dilution in violation of 15 U.S.C. § 1125(c), (FAC ¶¶ 22–27); (2) cybersquatting in violation of 15 U.S.C. § 1125(d), (*id.* ¶¶ 28–33); (3) deceptive acts and false advertising under NYGBL §§ 349 and 350, (*id.* ¶¶ 34–38); and (4) trademark dilution under NYGBL § 360-l, (*id.* ¶¶ 39–44).  In turn, NameMedia asserted two counterclaims against NWS, seeking (1) a declaratory judgment of the invalidity and unenforceability of the Mark Registration pursuant to 15 U.S.C. § 1119, (Def.'s Counterclaims ¶¶ 7–22), and (2) a declaratory judgment that NWS is liable to NameMedia "for all [] damages incurred as a result of Plaintiff's meritless enforcement of [the] [R]egistration," pursuant to 15 U.S.C. § 1120, (*id.* ¶¶ 23–30).  In addition, NameMedia requests an Order pursuant to 15 U.S.C. § 1117(a) declaring this matter to be an "exceptional case," thereby entitling NameMedia to litigation expenses.  (*Id.* at Prayer for Relief.)

Pursuant to the Motion Scheduling Order entered by the Court on April 18, 2013, (Dkt. No. 61), Defendant filed its Motion for Summary Judgment and accompanying papers on May 24, 2013, (Dkt. Nos. 68–72), and Plaintiff filed its Cross-Motion for Summary Judgment and accompanying papers on June 28, 2013, (Dkt. Nos. 76–81).[7]  On July 19, 2013, Defendant filed a

---

[7] On May 29, 2013, the Court granted Plaintiff's Motion to Substitute Counsel, thus terminating Coyne as counsel for Plaintiff.  (*See* Dkt. (minute entry for May 29, 2013).)  Coyne's

Motion To Strike documents that Plaintiff submitted with its Cross-Motion for Summary Judgment, and accompanying papers, (Dkt. Nos. 87–90), as well as its opposition papers to Plaintiff's Cross-Motion for Summary Judgment, (Dkt. Nos. 91–93).  Plaintiff, in turn, filed a Cross-Motion To Strike documents Defendant submitted in connection with its Motion To Strike, and accompanying papers, on August 2, 2013. (Dkt. Nos. 94–97.)  On August 9, 2013, Defendant filed its opposition papers to Plaintiff's Cross-Motion To Strike.  (Dkt. Nos. 98–99.)  The Court heard oral argument on all of the pending Motions on January 14, 2014.  (*See* January 14, 2014 Hearing Transcript (Dkt. No. 106).)

## II. Discussion

### A.  The Motions To Strike

NameMedia moves to strike several exhibits and portions of declarations that Plaintiff submitted in its Motion for Summary Judgment.  (*See* Def.'s Notice of Mot. To Exclude and Strike Evid. Pursuant to Fed. R. Civ. P. 37 and 56 (Dkt. No. 87).)  Plaintiff, in turn, seeks to strike certain evidence submitted in connection with Defendant's Motion to Strike.  (Pl.'s Notice of Cross-Mot. to Strike (Dkt. No. 94).)

"Because a decision on the motion to strike may affect [a] movant's ability to prevail on summary judgment, it is appropriate to consider the Motion[s] [T]o Strike prior to the [Parties']

---

representation of Plaintiff was marked by a consistently suspicious course of conduct, replete with misrepresentations and ethically suspect actions.  For example, despite having filed with the Court multiple notices seeking to substitute himself and Coyne Legal Group, PLLC as counsel for Plaintiff in this Action, (*see* Dkt. Nos. 6, 39), Coyne told the Court that he had "never filed a notice of appearance in this case," (*see* Letter from Robert F. Coyne, Esq. to Court (Apr. 23, 2013) (Dkt. No. 63); *see also* Letter from Cameron S. Reuber, Esq. to Court (Apr. 23, 2013) (Dkt. No. 62)).  More troubling, Coyne admitted to the Court that he backdated a retainer agreement in connection with his representation of Plaintiff.  (*See* Hr'g Tr. 26, 30–31 (May 28, 2013 Hr'g).)

Motion[s] for Summary Judgment." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d

206, 213 (S.D.N.Y. 2007) (alteration and internal quotation marks omitted), *aff'd*, 354 F. App'x

496 (2d Cir. 2009).

### 1.  Applicable Law

#### a. Rules 26 and 37

Rule 26(a) of the Federal Rules of Civil Procedure requires parties to provide, among

other things, "the name . . . of each individual likely to have discoverable information . . . that the

disclosing party may use to support its claims or defenses, unless the use would be solely for

impeachment."  Fed. R. Civ. P. 26(a)(1)(A)(i).  Moreover, parties must provide "a copy—or a

description by category and location—of all documents, electronically stored information, and

tangible things that the disclosing party has in its possession, custody, or control and may use to

support its claims or defenses, unless the use would be solely for impeachment."  Fed. R. Civ. P.

26(a)(1)(A)(ii).  Under this Rule, "use" includes any use "to support a motion, or at trial."

*Emmpresa Cubana Del Tabaco v. Culbro Corp.*, 213 F.R.D. 151, 159 (S.D.N.Y. 2003) (internal

quotation marks omitted); *see also Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*, No. 01-

CV-1047, 2002 WL 31108380, at *1 (S.D.N.Y. Sept. 23, 2002) (same).

"Several provisions of the Federal Rules of Civil Procedure authorize a court to impose

sanctions for untimely, incomplete, or misleading responses during discovery."  *Markey v.

Lapolla Indus. Inc.*, No. 12-CV-4622, 2015 WL 5027522, at *16 (E.D.N.Y. Aug. 25, 2015).  As

relevant here, Rule 37(c) provides in part that:

> If a party fails to provide information or identify a witness as required by Rule
> 26(a) or (e), the party is not allowed to use that information or witness to supply
> evidence on a motion, at a hearing, or at a trial, unless the failure was substantially

> justified or is harmless. In addition to or instead of this sanction, the court, on
> motion and after giving an opportunity to be heard . . . may order payment of the
> reasonable expenses, including attorney's fees, caused by the failure . . . .

Fed. R. Civ. P. 37(c)(1). "Where . . . the nature of the alleged breach of a discovery

obligation is the non-production of evidence, a district court has broad discretion in

fashioning an appropriate sanction . . . ." *Residential Funding Corp. v. DeGeorge Fin.

Corp.*, 306 F.3d 99, 107 (2d Cir. 2002); *see also Markey*, 2015 WL 5027522, at *16

(same). "Rule 37(c)(1) is intended to prevent the practice of 'sandbagging' an opposing

party with new evidence." *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-CV-

6646, 2015 WL 1402049, at *21 (S.D.N.Y. Mar. 25, 2015) (internal quotation marks

omitted). Moreover, sanctions are appropriate under Federal Rule of Civil Procedure

37(d) when a party fails to attend his or her own deposition. *See In re Durand*, No. 07-

CV-5037, 2008 WL 4282601, at *5 (E.D.N.Y. Sept. 16, 2008).

 "The party seeking Rule 37 sanctions bears the burden of showing that the

opposing party failed to timely disclose information." *Markey*, 2015 WL 5027522, at *16

(internal quotation marks omitted). To determine whether preclusion is warranted under

Rule 37, a court must consider "(1) the party's explanation for the failure to comply with

the disclosure requirement; (2) the importance of the testimony of the precluded

witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare

to meet the new [evidence]; and (4) the possibility of a continuance." *Design Strategy,

Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) (alterations and internal quotation marks

omitted) (quoting *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)) (the

"*Patterson* Factors"); *see also Richmond v. Gen. Nutrition Ctrs. Inc.*, No. 08-CV-3577,

16

2012 WL 762307, at *6 (S.D.N.Y. Mar. 9, 2012) (same).  Moreover, "although a 'bad-faith' violation of . . . Rule 26 is not *required* in order to exclude evidence pursuant to Rule 37, it can be taken into account as part of the party's explanation for its failure to comply."  *Design Strategy*, 469 F.3d at 296; *see also S.E.C. v. CKB168 Holdings, Ltd.*, No. 13-CV-5584, 2015 WL 4872553, at *4 (E.D.N.Y. Jan. 7, 2015) (same), *adopted in part by* 2015 WL 4872555 (E.D.N.Y. Aug. 12, 2015).  Finally, it is worth noting that preclusion is not a mandatory sanction.  *See Design Strategy*, 469 F.3d at 297–98.  Indeed, it bears emphasizing that "[p]reclusion is a 'harsh remedy' that 'should be imposed only in rare situations.'"  *CKB168 Holdings, Ltd.*, 2015 WL 4872553, at *4 (quoting *Izzo v. ING Life Ins. & Annuity Co.*, 235 F.R.D. 177, 186 (E.D.N.Y. 2005)).

b. Admissibility

Federal Rule of Civil Procedure 56(c)(4) requires that, in a summary judgment motion, an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Therefore, "[a] court may 'strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay[,] or make generalized and conclusory statements.'"  *Rockport Co. v. Deer Stags, Inc*., 65 F. Supp. 2d 189, 191 (S.D.N.Y. 1999) (quoting *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999)); *see also Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) (noting that inadmissible statements in affidavits submitted in support of a summary judgment motion are incapable of raising material disputes of fact); *Newport Elecs., Inc. v. Newport Corp.*, 157 F. Supp. 2d 202, 208 (D. Conn. 2001) (explaining that "[a] motion to strike is the correct

vehicle to challenge materials submitted in connection with a summary judgment motion [and is appropriate if] affidavits . . . contain inadmissible hearsay or are not made on the basis of personal knowledge[,] . . . if depositions contain testimony that contains hearsay, speculation[,] or conclusory statements[,] . . . [or if] documentary evidence . . . has not been properly authenticated" and collecting cases (citations omitted)).

Rule 56(e), in turn, provides that "[i]f a party fails to properly support an assertion of fact . . . the court may: (1) give an opportunity to properly support . . . the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it; or (4) issue any other appropriate order."  Similarly, Rule 56.1(d) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires that each assertion made by the movant or opponent in their Rule 56.1 Statements "must be followed by citation to evidence which would be admissible."  Accordingly, "only admissible evidence" need be considered on summary judgment; in addition, the "principles governing admissibility of evidence do not change on a motion for summary judgment."  *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (alteration and internal quotation marks omitted).  Moreover, if a party fails to properly support a statement by an adequate citation to the record, the Court may properly disregard that assertion.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73–74 (2d Cir. 2001) (noting that "district courts in the Southern and Eastern Districts of New York have interpreted current Local Rule 56.1 to provide that where there are no citations or where the cited materials do not support the factual assertions in the [s]tatements, the [c]ourt is free to disregard the assertion" and collecting cases (alteration and internal quotation marks omitted)).

<u>2.  Application</u>

<u>a.  NameMedia's Motion to Strike</u>

<u>i.  The Coyne Declaration</u>

NameMedia moves to preclude Coyne's declaration (the "Coyne Declaration") in its

entirety.  (Def.'s Mem. in Supp. of Def.'s Mot. to Exclude and Strike Pursuant to Fed. R. Civ. P.

37 and 56 ("Def.'s Strike Mem.") 15 (Dkt. No. 90).)  NameMedia argues that the Court should,

pursuant to Rules 37(b)(2) and 37(d), strike all evidence submitted by Coyne because he failed to

appear for his deposition and failed to respond to NameMedia's requests to reschedule that

deposition.[8]  (*Id.* at 1–2, 7, 15–16.)  NWS disputes this, stating that "[o]n 11/29/2012, a fax was

sent from Coyne Legal Group to counsel for Defendant," which stated that Coyne "would make

himself available for a deposition," (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Strike and in

Supp. of Pl.'s Cross-Mot. to Strike and in Further Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Strike

Mem.") 2 (Dkt. No. 95); *see also* Decl. of Robert F. Coyne in Supp. of Pl.'s Mem. of Law in

Opp'n to Def.'s Mot. To Strike and in Supp. of Pl.'s Cross-Mot. to Strike and in Further Supp. of

Pl.'s Mot. For Summ. J. ("Coyne Decl. II") ¶ 1 (Dkt. No. 96); *id.* at Ex. 1 ("November Fax")), and

that NameMedia, not NWS, "failed to reschedule the Coyne deposition prior to the close of

---

[8] For the purposes of this motion, the Court finds that Coyne was an "officer" of NWS during the relevant period.  Coyne declared under penalty of perjury that: (i) he caused the 2007 Delaware Entity to be formed in 2007 and dissolved in 2010; (ii) he caused the 2010 Wyoming Entity to be formed in 2010 and caused all assets and liabilities of the 2007 Delaware Entity to be transferred to the 2010 Wyoming Entity; (iii) he was a 50% owner of both entities until he allegedly "transferred all of [his] interest in New World Solutions, Inc. to Mr. Neal" on December 6, 2012 (i.e., after the close of discovery); and (iv) his "business activities with Mr. Neal commenced in early 2004 and continued until late 2012."  (Coyne Decl. ¶¶ 3–10.)  In addition, in his deposition Neal described Coyne as "the only other officer of [New World Solutions, Inc.]." (Neal Tr. 24.)  NWS makes no argument to the contrary.

discovery," (Pl.'s Strike Mem. 2).  In the alternative, NameMedia argues that the Court should,

pursuant to Fed. R. Civ. P. 37(c), strike Exhibits 1 and 3 to the Coyne Declaration because they

are responsive to NameMedia's document requests, but were first produced by NWS after the

close of discovery and in opposition to NameMedia's Motion for Summary Judgment and/or in

support of Plaintiff's Cross-Motion for Summary Judgment.  (Def.'s Strike Mem. 16.)  NWS does

not directly respond to this argument.

Although precluding evidence is a "drastic remedy" that "should be exercised with

caution," *DVL, Inc. v Gen. Elec. Co.,* 811 F Supp. 2d 579, 589 (N.D.N.Y. 2010) *aff'd sub nom.*

*DVL, Inc. v Niagara Mohawk Power Corp.*, 490 F. App'x 378 (2d Cir. 2012), the Court finds that

precluding all evidence submitted by Coyne is warranted.  NameMedia duly noticed Coyne for a

deposition on October 12, 2012.  (Decl. of Martin B. Schwimmer, Esq. in Supp. of Def.'s Mot. To

Exclude and Strike Evid. Pursuant to Fed. R. Civ. P. 37 and 56 ("Schwimmer Decl. II") Ex. F

(Dkt. No. 88).)  By letter dated October 9, 2012, then-counsel for NWS informed counsel for

NameMedia that "Mr. Coyne is in Manila and has been for some time; I will advise when I get

more information on his return."  (Schwimmer Decl. II Ex. G.)  By letter dated October 15,

2012—the close of fact discovery pursuant to the Court's Case Management and Scheduling

Order, (*see* Dkt. No. 14; Dkt. (minute entry for Aug. 8, 2012))—counsel for NameMedia wrote

"[w]e understand from our discussion with you and . . . Neal at his deposition on October [11,

2012] that . . . Coyne's exact whereabouts, as well as the timing of his expected return to the

United States, are both presently unknown.  We further understand that you will advise us

when . . . Coyne returns to the United States.  Until that time, we note that . . . Coyne has failed to

timely appear for a duly-noticed deposition.  Please accept this letter as our formal reservation of

20

rights concerning same." (Schwimmer Decl. II Ex. H.) There is no dispute that Coyne was never deposed. (*See* Def.'s Strike Mem. 7; Pl.'s Strike Mem. 2.)

Turning to whether preclusion of Coyne's evidence is warranted, the Court finds that the first factor—"the party's explanation for the failure to comply with the disclosure requirement," or in this case for his failure to appear for or reschedule his deposition, *Design Strategy*, 469 F.3d at 296 (alteration and internal quotation marks omitted), weighs in favor of preclusion. To begin, Coyne initiated this litigation, so there was no basis for him to duck the deposition. *See de Herbstein v. Dabbah Sec. Corp.*, 169 F.R.D. 36, 40 (S.D.N.Y. 1996) ("A party who brings an action presumptively obligates [himself] to sit for a deposition."). NWS claims that Coyne "clearly stated that he would make himself available for a deposition." (Pl.'s Strike Mem. 2.) To support this contention, Coyne submits the November Fax, which is a letter dated November 29, 2012 to Defendant's counsel that he allegedly sent via fax. (Coyne Decl. II Ex. 1.) In the November Fax, Coyne states:

> [Y]our allegation that I am in possession of material facts in this matter is completely false. I have virtually no knowledge of the facts in this case whatsoever. . . . As you are already aware my availability as a witness is extremely limited. However I am willing to accommodate your request for examination before trial by way of a telephonic deposition. Alternatively, I will agree to interrogatories in excess of 25 to be served upon me. However, I will reiterate that I have very little knowledge about any of the relevant facts in this matter. Mr. Neal was solely in charge of the registration of this name and the maintenance of the domain name and websites. Mr. Neal was also the primary organizer of all of the marketing that the company engaged in. Finally, Mr. Neal was solely responsible for the pre-incorporation marketing efforts of New World Solutions; therefore I have no testimony whatsoever to offer in that regard. . . . Given the foregoing, it is unclear to me what purpose any in person deposition would serve as there is no evidence on the record that I possess any knowledge of material facts.

(*Id.* at unnumbered 2.) Contrary to the November Fax's representation, however, the evidence

and Coyne's course of conduct in this Action shows that Coyne was intimately involved with NWS and this litigation.  Coyne instituted this Action on behalf of NWS and, according to Neal's testimony, provided the content of the responses to at least some of NameMedia's interrogatories. (Neal Tr. 67.)  Further, evidence submitted by NWS contradicts Coyne's characterization of his limited role and relevant knowledge—including, Neal's deposition testimony that Coyne and Neal were both "engaged in" and responsible for the alleged marketing and business activities of the d/b/a entity, (*see id.* at 31, 34), Coyne's declaration that he was a 50% owner of at least two of the NWS entities and was "associated with" and conducted business activities on behalf of NWS for eight years, (*see* Coyne Decl. I. ¶¶ 4, 6, 10, 12), and NWS's statement that "Coyne has knowledge regarding all claims which are the subject matter of the current litigation," (Pl.'s Resps. to Def.'s First Set of Interrogs. No. 18).  Additionally, it is worth noting that the November Fax was sent over a month after discovery in this case closed and there is no evidence that NWS requested an extension of the final discovery deadline.  Accordingly, the Court finds the representation that Coyne "clearly stated that he would make himself available for a deposition" to be disingenuous at best.  (*See* Pl.'s Strike Mem. 2.)

Moreover, there is no evidence that Defendant received the November Fax.  NameMedia asserts that it first received the fax on August 2, 2013, when Coyne submitted a copy in connection with NWS's briefing on the motions to strike.  (Decl. of Martin B. Schwimmer, Esq. in Further Supp. of Def.'s Mot. To Exclude and Strike Pursuant to Fed. R. Civ. P. 37 and 56 and in Opp'n to Pl.'s Cross-Mot. To Strike ("Schwimmer Decl. III") ¶ 13 (Dkt. No. 99).) NameMedia's counsel has submitted search results from its fax log, including a search which shows that, between January 1, 2012 and August 9, 2013, counsel for NameMedia received zero

faxes from the fax number on the Coyne Legal Group letterhead of the November Fax.  (*See id.* ¶ 15; *id.* at Ex. 7.)  NWS's e-mail responding to NameMedia's August 2, 2013 request for authentication that the November Fax was transmitted fails to confirm the same.  (*See* Schwimmer Decl. III ¶ 14; *id.* at Ex. 6.)  The only evidence in the record, then, suggests that the alleged November Fax was not transmitted or received.  In sum, because Coyne is a party, offers no explanation for his failure to timely appear for his deposition or request an extension of the discovery schedule, and his claim that he made himself available for a deposition by faxing Defendant's counsel on November 12, 2012 is precarious, at best, the first *Patterson* factor weighs in favor of preclusion.

As to the second factor, although neither Party makes an explicit argument as to the relative importance of the Coyne Declaration or of the inability of Defendant to depose Coyne due to his failure to appear for a deposition before the close of discovery, (*see* Def.'s Strike Mem. 15–16; Pl.'s Strike Mem. 2), the importance of the Coyne Declaration and his absent deposition testimony are apparent.  In his declaration, Coyne describes his involvement in creating and dissolving the 2007 Delaware Entity, creating the 2010 Wyoming Entity, his 50% ownership in both entities, his general involvement in NWS, and his business relationship with Neal.  (*See generally* Coyne Decl. I.)  Coyne attaches exhibits to support these statements.  (*See id.*)  This information is clearly relevant to the claims in this Action.  Moreover, the importance of Defendant's ability to depose Coyne in light of this information is obvious.  For similar reasons, the third factor—prejudice to NameMedia—weighs in favor of preclusion.  NameMedia had no opportunity prior to the Motions for Summary Judgment to question Coyne about his assertions of fact in his declaration, including his statements that he and Neal conducted continuous business

activities under the "New World Solutions" mark between 2004 and 2012, (*see* Coyne Decl. I

¶ 10), or his statements regarding the alleged continuity between the d/b/a, Delaware, and

Wyoming entities, (*see id.* ¶¶ 3–9; *id.* at Exs. 1–3).  The third *Patterson* factor thus cuts strongly

in favor of precluding evidence submitted by Coyne.  *See DVL, Inc.*, 811 F Supp. 2d at 591

(granting a motion to strike expert declarations submitted after the close of discovery because

"[a]dmitting the . . . [d]eclarations for the purpose of the [c]ourt's determination of the various

summary judgment [m]otions would greatly prejudice the [d]efendants").

Turning to the fourth factor, NameMedia argues that "because the parties are in the middle

of the current summary judgment briefing schedule, there is no 'possibility of a continuance.'"

(Def.'s Strike Mem. 16 (quoting *Schiller v. City of N.Y.*, Nos. 04-CV-7922, 04-CV-7921, 2008

WL 4525341, at *7 (S.D.N.Y. Oct. 9, 2008)).).  Although the Court could theoretically re-open

discovery, order Coyne to appear for a deposition, and permit the Parties to re-submit motions for

summary judgment, doing so would "serve no purpose except to encourage parties to disregard

the Court's scheduling order . . .  [and would] result in further delay."  *Lidle v. Cirrus Design

Corp.*, No. 08-CV-1253, 2009 WL 4907201, at *7–8 (S.D.N.Y. Dec. 18, 2009).  In addition, at

the time that Coyne submitted his declaration, discovery had been closed for nearly a year.  *See

Design Strategy*, 469 F.3d at 297 (explaining that "weighing heavily on both the prejudice and

possibility of continuance factors was the fact that discovery had been closed for approximately

one and a half years" (internal quotation marks omitted)); *523 IP LLC v. CureMD.Com*, 48 F.

Supp. 3d 600, 638 (S.D.N.Y. 2014) (explaining that "to reopen discovery . . . a year after it ha[d]

closed, would seem to be an unjustified drain on the resources of the parties and the [c]ourt and

weighs in favor of preclusion").

Finally, it is worth noting that although preclusion under Rule 37 is warranted in the absence of a finding of bad faith, it is difficult to conceive how NWS's purported founder, owner, principal, and lawyer could bring this Action and then in good faith fail to appear for a duly noticed deposition, fail to reschedule the same in a timely manner, and disavow that he has knowledge of material facts, only to submit a declaration in connection with the Summary Judgment Motions with highly relevant information when there is no possibility, absent the re-opening of discovery, in which he could have been cross-examined on the information that he provides.  The Court finds that the only logical inference in light of these facts, in the absence of another explanation, is that Coyne's failure to appear for his deposition was in bad faith, which strengthens the conclusion that this evidence should be precluded.  *See Design Strategy*, 469 F.3d at 296 (holding that Rule 37(c)(1) "does not require a showing of bad faith" but that bad faith "can be taken into account as part of the party's explanation for its failure to comply"); *Gagasoules v. MBF Leasing LLC*, 286 F.R.D. 205, 214 (E.D.N.Y. 2012) ("'Rule 37(d) makes it explicit that a party properly served has an absolute duty to respond, that is, to present himself for the taking of his deposition, . . . and that the court in which the action is pending may enforce this duty by imposing sanctions for its violation.'" (alteration in original) (quoting *Penthouse Int'l, Ltd. v. Playboy Enters.*, Inc., 663 F.2d 371, 390 (2d Cir. 1981))).  Accordingly, NameMedia's Motion to Strike the Coyne Declaration and the accompanying Exhibits pursuant to Rule 37(d) is granted.[9]

---

[9] Because the Motion To Strike the Coyne Declaration and accompanying exhibits is granted, there is no need to address Defendant's alternative argument that Exhibits 1 and 3 of the Coyne Declaration must be excluded pursuant to Fed. R. Civ. P. 37(c)(1).

### ii.  The Neal Exhibits and the Kossar Declaration

NameMedia also moves to strike Exhibits 1, 2, 4–11 and 17–19 to the Neal Declaration (the "Neal Exhibits"), paragraphs 15 through 30 of the Neal Declaration, and portions of Exhibit 3 to the Kossar Declaration, which contain the relevant excerpts from Neal's Deposition.[10] NameMedia moves to strike the Neal Exhibits pursuant to Fed. R. Civ. P. 37(c), arguing that the challenged exhibits are "responsive to NameMedia's prior-served document requests and should have been disclosed during discovery," but were instead "first . . . produced . . . in support of [NWS's] summary judgment papers on June 28, 2013."  (Def.'s Strike Mem. 1, 3.)[11] NameMedia moves to strike portions of both the Neal Declaration and Exhibit 3 to the Kossar Declaration pursuant to Fed. R. Civ. P. 56(c) and (e), arguing that the evidence contained therein is inadmissible because it is irrelevant and is not based on Neal's personal knowledge.  (*Id.* at 17–19.)

---

[10] NameMedia incorrectly identifies the Neal Deposition excerpts as Exhibit 4 to the Kossar declaration.  (*See* Def.'s Mem. 17; Kossar Decl. ¶ 4.)

[11] NameMedia also argues that the Neal exhibits are inadmissible because they are irrelevant to the "threshold issue of the [S]ummary [J]udgment [M]otion" for all four of NWS's claims against NameMedia, namely "Plaintiff['s ability to] demonstrate trademark priority as of March 2005."  (Def.'s Strike Mem. 2–3.)  NameMedia is correct that the Neal exhibits are not relevant to any of the determinative questions about the status of the Mark in March of 2005— that is, whether it was in use, and whether it was "famous" and/or "distinctive" for purposes of the Federal Trade Dilution Act, the Anticybersquatting Protection Act, or dilution under the NYGBL. However, some of the challenged exhibits are relevant to other elements of NWS's claims, including whether NameMedia had a "bad faith intent to profit" from the Mark for purposes of the ACPA or whether NameMedia's conduct is "misleading" for purposes of the NYGBL claims. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has *any tendency* to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." (emphasis added)).

### a.  Neal Exhibits 1 and 2

Neal Exhibits 1 and 2 are screenshots of the website located at

www.newworldsolutions.com allegedly accessed by Neal on March 1, 2012 and June 29, 2012,

respectively.  (Neal Decl. ¶¶ 4–5; *id.* at Exs. 1–2.)  During discovery, NWS made a single 91-page

document production that included only one screenshot of the website located at

www.newworldsolutions.com.  (*See* Def.'s Strike Mem. 8–9; Schwimmer Decl. II ¶ 3.)  There is a

marked difference in the content displayed on the holding page screenshot produced by NWS in

discovery and in the content of Neal Exhibits 1 and 2.  (*Compare* Schwimmer Decl. I Ex. 19, at

00088, *with* Neal Decl. Exs. 1–2.)  The former displays as "Related Searches" a miscellaneous

array of "New World" phrases, (e.g., "New World Hotel Beijing"), whereas Neal Exhibits 1 and 2

show "Related Searches" primarily related to debt relief and technology outsourcing.  NWS uses

Neal Exhibits 1 and 2 to support its allegation that (1) NameMedia has engaged in deceptive acts

and false advertising under the NYGBL, and (2) NameMedia has intentionally diluted trademarks

by extracting keywords from websites returned in searches for keywords relevant to

NameMedia's domain names and incorporating those keywords into its website.  (Pl.'s Mem. of

Law in Opp'n to Def.'s Mot. for Summ. J. and in Supp. of Pl.'s Cross-Mot. for Summ. J. ("Pl.'s

Summ. J. Mem.") 8–9 (Dkt. No. 81).)[12]

---

[12] To successfully assert a claim for deceptive acts under NYGBL § 349, or for false
advertising under NYGBL § 350, a plaintiff must establish that defendant engaged in
consumer-oriented conduct that was materially misleading.  *See Koch v. Acker, Merrall & Condit
Co.*, 967 N.E.2d 675, 675 (N.Y. 2012).  NameMedia asserts that NWS's claims under the statutes
are not viable because "[t]here is no evidence in the record that NameMedia's registration of the
Domain Name was misleading."  (Def.'s 56.1 ¶ 69.)  NWS counters by citing to Neal Exhibits 1
and 2 to support its assertion that "Neal has testified that [D]efendant intentionally misleads
consumers with its 'optimization' process by incorporating keywords entered by users visiting the

Preclusion of these exhibits is warranted.  First, NWS offers no convincing explanation for its failure to produce the Neal Exhibits during discovery, despite the fact that Defendant requested documents concerning Internet searches conducted on behalf of Plaintiff or by Plaintiff concerning the Mark, documents concerning the Domain Name, documents NWS intended to rely upon on the instant Action, all documents supporting Plaintiff's Complaint, and all documents refuting Defendant's Answer.  (Schwimmer Decl. II ¶¶ 4, 10; *see* Schwimmer Decl. I Ex. 10 Combined First Set of Reqs. for Docs. by Def. and Pl.'s Resps. Thereto ("Reqs. for Docs.") Nos. 12, 14, 26, 33–35.)[13]  Plaintiff argues that Neal Exhibits 1 and 2 should be considered because they respond to NameMedia's assertions—made for the first time in connection with NameMedia's Motion for Summary Judgment—that NameMedia (1) employs a "robot exclusion" policy, (2) "perform[s] 'searches' of their name inventory," and (3) "do[es] not knowingly register other's trade names."  (Pl.'s Strike Mem. 2–3.)  This argument does not, however, apply to these particular exhibits, which only support NWS's allegation that NameMedia uses a

---

site," that "[D]efendant employs a mechanism to incorporate search terms into its websites comprised of keywords typed into a keyword search box on the same website," and that "[o]n June 29, 2012, the website www.newworldsolutions.com displayed the following phrases: 'Technology outsourcing', 'Manila outsourcing', 'technology consulting', [and] 'IT Outsourcing'."  (Pl.'s 56.1 ¶¶ 69, 79, 85.)

[13] In particular, the screenshots are responsive to NameMedia's Document Requests Nos. 13 ("All Internet searches conducted on behalf of Defendant's domain www.newworldsolutions.com, and all documents . . . concerning the same."), 14 ("Documents comprising, referring, or relating to any searches, research, investigations[,] or other inquiries concerning Defendant or the domain name www.newworldsolutions.com . . . ."), and 33 ("All documents Plaintiff intends to rely upon in connection with this proceeding.").  (Reqs. for Docs. Nos. 13, 14, 33.)  NameMedia served the document requests on NWS on April 13, 2012, and, by an email sent on September 21, 2012, notified then-counsel for NWS that NameMedia would move to exclude all discovery materials not produced in advance of its noticed Depositions.  (*See* Def.'s Strike Mem. 4; Schwimmer Decl. II ¶¶ 8,10; *id.* at Ex. C.)

"keyword optimization policy" to mislead consumers and dilute trademarks. The first factor, then, weighs in favor of preclusion. *See 523 IP LLC*, 48 F. Supp. 3d at 638 (precluding evidence where the defendant "d[id] not even explain why it produced the documents responsive to the [relevant] subpoena until after the close of discovery," and did "not attempt to argue that its failure to disclose was 'substantially justified'").

The second factor weighs against preclusion because in general evidence of a policy to mislead customers and dilute trademarks would have been relevant to establishing Plaintiff's claims, as explained below. Nevertheless, the third factor cuts in favor of preclusion. NameMedia is prejudiced by the post-discovery introduction of Neal Exhibits 1 and 2 because they differ in relevant respects from the holding page screenshot produced by NWS in discovery. Although Plaintiff argues that Defendant is not prejudiced because "Plaintiff is simply using . . . Defendant's own materials to rebut . . . Defendant's own statements," (Pl.'s Strike Mem. 2–3), Defendant disputes that the website printouts are its "own materials," explaining that NameMedia "operates close to a million websites that can change on a frequent basis," and, therefore, the multiple screenshots are not properly considered its own materials. (Mem. in Further Supp. of Def.'s Mot. To Exclude and Strike Pursuant to Fed. R. Civ. P. 37 and 56 and in Opp'n to Pl.'s Cross-Mot. To Strike ("Def.'s Strike Reply") 15 (Dkt. No. 98).) The Court agrees that the screenshots are not Defendant's "own materials," but rather were documents that were in the control and possession of Plaintiff based on websites that Neal accessed on specific days. By producing these documents after the close of discovery, NameMedia did not have an opportunity to question Neal about the exhibits or introduce evidence to refute the conclusions he draws from the exhibits. *See 523 IP LLC*, 48 F. Supp. 3d at 638 (explaining that the prejudice to the plaintiff

from the failure to disclose was significant because it was the defendant's "obligation to identify evidence underlying its defenses and the witnesses who may possess such evidence," and because it did not, the plaintiff did not have the opportunity to depose the relevant people or seek its own discovery).

Fourth, as explained above, a continuance is not warranted at this stage of the proceedings. Because three of the four *Patterson* factors weigh in favor of preclusion, these exhibits are precluded. *See 523 IP LLC*, 48 F. Supp. 3d at 638 (precluding evidence when three of the four factors favor preclusion).

<u>b.  Neal Exhibits 4–6</u>

Neal Exhibits 4 and 5 are HTML source code for the www.newworldsolutions.com website, which Neal allegedly accessed on March 1, 2012 and June 25, 2013, respectively.  (Neal Decl. ¶¶ 7–10; *id.* at Exs. 4–5.)  Neal Exhibit 6 is a printout from a website of the "W3C org specification regarding the ROBOTS HTML META-TAG," which Neal allegedly accessed on June 25, 2013.  (Neal Decl. ¶ 11; *id.* at Ex. 6.)  NWS relies on Neal Exhibits 4, 5 and 6 to argue that, contrary to its representation otherwise, NameMedia does not use a robot exclusion policy to prevent search engines from indexing their website, but "actually encourages [indexing]."  (Pl.'s Summ. J. Mem. 11–12; *see also* Pl.'s 56.1 ¶ 9.)

The *Patterson* factors counsel against excluding Neal Exhibits 4, 5, and 6.  First, NWS offers no explanation of its failure to produce Exhibits 4, 5, and 6 during discovery despite its control and possession over those documents and their responsiveness to Defendant's

interrogatories.[14]   Nevertheless, its argument that the belated submission of the Neal Exhibits is

justified applies to these exhibits because they respond to NameMedia's claim—made for the first

time in connection with NameMedia's Motion for Summary Judgment—that NameMedia

employs a "robot exclusion" policy.  (Pl.'s Strike Mem. 2–3.)  NameMedia defends the timing of

Zilinek's statements, claiming that summary judgment presented its "first and only opportunit[y]

in this action to use . . . Zilinek's knowledge and expertise regarding NameMedia's business

policies"—including the alleged "robot exclusion" policy—because NWS failed to properly

notice Zilinek for a deposition.  (Def.'s Strike Reply 5.)  NWS's apparent failure to vigorously

prosecute this action notwithstanding, its explanation for the belated submission of Neal Exhibits

4, 5, and 6 is reasonable.  Second, while the Court is not at all convinced that Exhibits 4, 5, and 6

are important to Plaintiff's claims because its dilution claims ultimately fail on other grounds, as

explained below, in light of Zilinek's statements, Plaintiff should be allowed to rebut his claims.

Third, in its Motion To Strike briefing, NameMedia has provided a substantive response to Neal

Exhibits 4, 5 and 6, which indicates that the late submission did not substantially prejudice

NameMedia.  In any event, the robot exclusion policy, or lack thereof, is an immaterial dispute of

fact for the resolution of the Summary Judgment Motions and, therefore, there is no apparent

prejudice.  Accordingly, Defendant's Motion To Strike Neal Exhibits 4, 5, and 6 is denied.

---

[14] At a minimum, Neal Exhibits 4, 5 and 6 are responsive to NameMedia's Document
Requests Nos. 13 ("All Internet searches conducted on behalf of Defendant's domain
www.newworldsolutions.com, and all documents . . . concerning the same.") and 14 ("Documents
comprising, referring, or relating to any searches, research, investigations[,] or other inquiries
concerning Defendant or the domain name www.newworldsolutions.com . . . .").  (Reqs. for
Docs. Nos. 13, 14.)

<u>c.  Neal Exhibits 7–11</u>

Neal Exhibits 7 and 8 are printouts of webpages from www.smartname.com, which Neal allegedly accessed on June 25, 2013 and June 28, 2013, respectively.  (Neal Decl. ¶¶ 12–13; *id.* at Exs. 7–8.)  Neal Exhibit 9 is allegedly the result of Neal's June 25, 2013 search for "newworldsolutions.com" on www.who.is.  (Neal Decl. ¶ 14; *id.* at Ex. 9.)  NWS cites Neal Exhibits 7, 8 and 9 to support its assertion that NameMedia "employs 'optimization' of its domain names specifically designed to divert traffic and confuse consumers."  (Pl.'s 56.1 ¶ 11; *see also* Pl.'s Summ. J. Mem. 8.)  Neal Exhibit 10 is allegedly a printout from the URL www.domparison.com/domain-name-price-comparison/, accessed on June 27, 2013, (Neal Decl. ¶ 31), which NWS uses to support its assertion that NameMedia's price quote "was in excess of the out of pocket expenses to acquire the name," (Pl.'s 56.1 ¶ 82), and was "unreasonable, exorbitant[,] and extortionate," (Pl.'s Summ. J. Mem. 7).  Neal Exhibit 11 is allegedly a printout from the URL www.icann.org/en/help/dndr/udrp/policy, accessed on June 27, 2013, (Neal Decl. ¶ 32), which NWS cites as evidence that NameMedia's registration of the Domain Name and its price quote were in bad faith for purposes of the ACPA, (Pl.'s 56.1 ¶¶ 83–84; *see also* Pl.'s Summ. J. Mem. 7–8.)

The *Patterson* factors counsel in favor of excluding Neal Exhibits 7, 8, 9, 10, and 11 for substantially the same reasons they counsel in favor or excluding Neal Exhibits 1 and 2.  In particular, there is no reasonable explanation for failing to produce those Exhibits during discovery, Plaintiff's explanation as to its need to respond to evidence and/or explanations provided by Zilinek are inapplicable to these exhibits, and NameMedia is prejudiced by its

inability to address or take discovery on these exhibits.[15]  Accordingly, Defendant's Motion To Strike is granted as to Neal Exhibits 7, 8, 9, 10, and 11.

<u>d.  Neal Exhibits 17–19</u>

Neal Exhibits 17 through 19 are allegedly the "result[s]" of Neal's accessing, on June 27, 2013, the websites at www.newworldsolutions.org, www.newworld-solutions.com, and namemedia.com/our-business/domain-marketplace/, respectively.  (Neal Decl. ¶¶ 42–44; *id.* at Exs. 17–19.)  NWS cites Neal Exhibits 17 and 18 to rebut NameMedia's assertions that two other organizations named "New World Solutions" maintain websites.  (*See* Def.'s 56.1 ¶¶ 63–64; Pl.'s 56.1 ¶¶ 63–64.)  NWS cites Neal Exhibit 19 as evidence that NameMedia admits that it "traffics in domain names."  (Pl.'s 56.1 ¶¶ 68, 81.)

The *Patterson* factors counsel against excluding Neal Exhibits 17 and 18.  First, NameMedia first alleged the existence and websites of other organizations called "New World Solutions" in its Motion for Summary Judgment, (*see* Def.'s 56.1 ¶¶ 59–64), which provides NWS with a reasonable explanation for its post-discovery submission of Exhibits 17 and 18.  Second, while the existence (or not) of two of the alleged websites does not carry much weight with respect to whether the Mark is "famous" or "distinctive" for purposes of Plaintiff's claims, it is relevant to that determination.  Third, prejudice to NameMedia is de minimis especially because NameMedia first alleged the existence of other "New World Solutions" in its moving papers for Summary Judgment.

---

[15] At a minimum, Neal Exhibits 7 through 11 are responsive to NameMedia's Document Request No. 33.  Exhibits 7 through 9 are also responsive to Request Nos. 13 and 14.  (*See* Reqs. for Docs. Nos. 13–14, 33.)

Conversely, Exhibit 19 should be excluded.  NWS does not and cannot explain its failure to disclose the NameMedia website print-out.  The statements about NameMedia's business model do not provide essential evidence for any of the claims at issue because these claims are dismissed on grounds, as explained below, that make this evidence irrelevant, and NameMedia is prejudiced by its inability to address or take discovery regarding Exhibit 19.

<u>e. Challenged Neal Testimony</u>

The challenged portions of Neal's deposition and declaration relate to NameMedia's alleged keyword optimization policy and Neal's attempts to "verify" the existence of the same by entering keywords relevant to NWS's business activities into the search box on the website at www.newworldsolutions.com, and then allegedly discovering that those keywords newly appeared on that website.  (*See* Neal Tr. 119, 121–125; Neal Decl. ¶¶ 15–30.)[16]  NWS argues that the "sole purpose" of the alleged keyword optimization policy is the "intentional dilution of rightful mark holders who own names which are the same or confusingly similar to the defendants['] domain name."  (Pl.'s Summ. J. Mem. 9; *see also* Pl.'s 56.1 ¶¶ 68–69.)

NameMedia argues that Neal's testimony is irrelevant, and therefore inadmissible, under Federal Rule of Evidence 402, because the keyword optimization policy which Neal allegedly attempted to verify is, according to Neal's deposition testimony, the stated policy of a third party, "[which Plaintiff] think[s] is a subsidiary of NameMedia."  (Def.'s Strike Mem. 18; Neal Tr.

---

[16] Neal testified that, based on his activities "[i]t appeared to [Neal] that this website was looking at our website or the Coyne Legal Group or Credit Legal Group website, which was hosted on the same [server], and extracting key words and placing them on their website."  (Neal Tr. 326.)  NWS proffers the alleged keyword optimization policy as evidence of dilution and bad faith.  (Pl.'s 56.1 ¶ 68.)

120.)[17]  NameMedia further argues that Neal is not competent to testify about a third party's

alleged keyword optimization policy because (1) NWS did not disclose Neal as an expert witness,

as required under Fed. R. Civ. P. 26(a)(2), and (2) Neal's own testimony establishes that he has no

"personal knowledge" of the alleged policy, as required under Federal Rule of Evidence 602.

(Def.'s Strike Mem. 19.)[18]  In addition, NameMedia contends that Neal misunderstands the

computer source code, which NWS contends proves that NameMedia "not only allows search

engines to index their websites, but actually encourages them to do so."  (Def.'s Mem. in Opp'n

to Pl.'s Cross-Mot. for Summ. J. and in Further Supp. of Def.'s Mot. for Summ. J. ("Def.'s

Summ. J. Reply") 11 n.11 (Dkt. No. 91); Pl.'s Summ. J. Mem. 11–12.)

  NameMedia is correct that the "optimization policy" allegedly described on the website of

an entity that NWS "think[s] is a subsidiary of NameMedia" is not relevant to this Action, and

that Neal's testimony about the same is, therefore, inadmissible under Federal Rule of Evidence

402.  In his deposition, Neal based his conclusion that "[i]t appear[s] . . . that

[www.newworldsolutions.com] was looking at our website or the Coyne Legal Group or Credit

Legal Group website . . . and extracting key words and placing them on their website" on

"looking at the [possible] subsidiary's . . . documented policy that they perform searches on key

---

[17] NameMedia also argues that NWS could have obtained evidence of NameMedia's optimization policy if it had deposed any of the NameMedia officers disclosed in NameMedia's Rule 26 Supplemental Initial Disclosures and other Discovery Responses.  (Def.'s Mem. in Opp'n to Pl.'s Cross-Mot. for Summ. J. and in Further Supp. of Def.'s Mot. for Summ. J. 11.)

[18] Federal Rule of Evidence 602 provides in pertinent part that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may consist of the witness's own testimony."  Pursuant to Rule 601, "[e]very person is competent to be a witness unless the[]

words as part of their domain names, look at the websites which have those key words in them and extract key words from those websites and place them on their own websites."  (Neal Tr. 326–27.)  Neal testified that he did not know the name of the "assumed subsidiary," that only one of several "alleged subsidiar[ies] [he] [looked at] . . . appeared to have this policy to drive traffic to the NameMedia registered websites," that he "did[] [not] find anything on [a] NameMedia website," "[did not] know if NameMedia has th[is] policy or not," and that he has "no evidence"—other than the unspecified alleged subsidiary's stated policy—that NameMedia conducted any kind of key word optimization on www.newworldsolutions.com.  (*Id.* at 328–30, 332.)

The rest of the challenged testimony pertains to actions allegedly taken by Neal on newworldsolutions.com.  However, it is far from clear that Neal's "tests" establish anything about NameMedia's alleged optimization policy.  In addition to testifying that he has "no evidence" that NameMedia has a keyword optimization policy, Neal testified that he "ha[s] no idea" whether his entering terms in the search box on www.newworldsolutions.com caused some of those terms to subsequently appear on the website.  (Neal Tr. 124–125.)  Pursuant to Federal Rule of Evidence 401, evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."  Because Neal's testimony about his keyword searches on www.newworldsolutions.com does not make more or less probable the existence of the alleged keyword optimization policy, the testimony is not relevant and is therefore inadmissible under Federal Rule of Evidence 402.

---

rules provide otherwise."  Rule 701(a) provides that lay witness "testimony in the form of an opinion is limited to one that is . . . rationally based on the witness's perception."

Moreover, as relevant to Rule 602, "[t]he test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." *New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 423, 425 (S.D.N.Y. 2000); *see also Peters v. Molloy Coll. of Rockville Ctr.*, No. 07-CV-2553, 2010 WL 3170528, at *2 (E.D.N.Y. Aug. 10, 2010) (same). Neal testified that does not know whether NameMedia has a keyword optimization policy and he did not know why the words he typed on the search box subsequently appeared on the website. The testimony, then, is also inadmissible under Rule 602. The Motion To Strike pages 119–129 and 325–335 of Neal's deposition testimony, and to strike paragraphs 15–30 of the Neal Declaration, is, therefore, granted.[19] *See Lehman Bros. Commercial Corp v. China Int'l United Petroleum & Chems. Co.*, No. 94-CV-8304, 1995 WL 380106, at *2 (S.D.N.Y. June 26, 1995) ("If the evidence to be offered in support of the allegation would be inadmissible at trial, then the motion to strike that allegation should be granted.").

b. NWS's Motion to Strike

As an initial matter, NameMedia correctly points out that Plaintiff submitted its Cross-Motion to Strike without the permission of the Court. (*See* Def.'s Strike Reply 3–4.) Pursuant to Local Civil Rule 37.2 and this Court's Rules, NWS should have submitted a letter requesting leave to bring its Cross-Motion. Nevertheless, the Court considers the merits of the Motion, as Defendant has filed a response that addresses Plaintiff's arguments.

---

[19] Even if the Court were to consider Neal's testimony regarding the alleged keyword optimization policy to support Plaintiff's theory that NameMedia engages in dilution, Plaintiff's claims fail on other grounds, as described below.

i.  The Zilinek Declarations

NWS cross-moves to strike all of Zilinek's declarations submitted in this Action (collectively, the "Zilinek Declarations").[20]  The apparent grounds for the Motion are that the Zilinek Declarations (1) contain "new evidence," and (2) are misleading because NameMedia does not consistently use robot exclusion on the website holding page associated with the Domain Name or its other websites.  (Pl.'s Strike Mem. 1.)  The Court construes NWS's Motion as a Motion to Strike Pursuant to Fed. R. Civ. P. 37(c)(1).

The *Patterson* factors weigh against granting NWS's Motion with respect to all portions of the Zilinek Declarations and accompanying exhibits, with one exception, as discussed below. First, there was no failure to disclose by NameMedia.  NameMedia identified Zilinek in its Supplemental Rule 26(a)(1) disclosures, (*see* Schwimmer Decl. III ¶ 5 & Ex. 2), but NWS failed to properly notice Zilinek for a deposition, (*see* Def.'s Strike Reply 5).  Because there is no failure to disclose Zilinek as a potential witness, there is no failure to excuse under the first factor.  *Cf. Fleming v. Verizon N.Y. Inc.*, No. 03-CV-5639, 2006 WL 2709766, at *7–9 (S.D.N.Y. Sept. 22,

_____

[20] Zilinek, Associate General Counsel for NameMedia, submitted three declarations in this action:  (1) Zilinek Decl. I, which describes NameMedia's business model and policies, including its alleged use of the method of "'robot exclusion' to prevent indexing of its holding pages by search engines," NameMedia's registration of the Domain Name, and certain events thereafter; (2) Decl. of Erik S. Zilinek, Esq. in Further Supp. of Def.'s Mot. for Summ. J. and in Opp'n to Pl.'s Cross-Mot. for Summ. J. ("Zilinek Decl. II") (Dkt. No. 93), which addresses NameMedia's policy for incorporating keywords onto the website holding pages for its domain name and refutes NWS's allegation that NameMedia "crawls" websites with similar domain names and incorporates keywords from those websites into its own websites; and (3) Decl. of Erik S. Zilinek, Esq. in Supp. of Def.'s Mot. To Strike and Exclude Evid. Pursuant to Fed. R. Civ. P. 37 and 56 ("Zilinek Decl. III") (Dkt. No. 89), which refutes NWS's allegation that Neal Decl. Exhibits 4 and 5 demonstrate that NameMedia does not use a robot exclusion policy.

2006) (granting the motion to preclude where the plaintiff failed to disclose the relevant names in the Rule 26(a)(1)(A) disclosures).

As to the second factor, NameMedia maintains that "whether its website crawls third-party websites, or is itself crawled by search engine 'robots,' is immaterial to the case-in-chief . . . [because] Plaintiff cannot establish trademark priority or rights prior to March 2005." (Def.'s Strike Reply 7.)  Nonetheless, NameMedia argues that the Zilinek Declarations are "necessary" to correct NWS's "incoherent and incompetent stab at contriving a disputed issue with regards to crawling and robot exclusion," and specifically to refute the source code evidence submitted by Neal in support of NWS's contention that NameMedia does not use robot exclusion. (*Id.* 6–7, 7 n.12.)  Because the Court denied NameMedia's Motion To Strike the evidence submitted by Neal pertaining to "robot exclusion," NameMedia's related submissions contained in Zilinek Declaration I and Zilinek Declaration III are relevant, and should likewise be considered.  Conversely, because the Court granted NameMedia's Motion to Strike the evidence submitted by Neal pertaining to the alleged "keyword optimization" policy, NameMedia's related submission, Zilinek Declaration II, is likewise excluded, but only to the extent that its irrelevance results from this ruling.

NameMedia also correctly notes that NWS's purported showing that the Zilinek submissions "misled" the Court and its ability to propound evidence that allegedly shows that NameMedia "does not engage in robot exclusion of any of its domain names" undermine the argument that NWS was prejudiced by the timing of Zilinek submissions.  (*See* Pl.'s Strike Mem. 1.)  Additionally, as NameMedia argues, NWS could have noticed Zilinek for a deposition or requested discovery from him.  Where, as here, the movant failed to properly notice for

deposition an identified witness, it cannot claim to have been "sandbagged" by that witness's evidence.  (*See id.* at 3.)  The Motion to Strike the Zilinek Declarations, to the extent that the information contained therein is relevant, is therefore denied.  *Cf. Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 145–46 (S.D.N.Y. 2009) (denying the motion to strike declarations where it was clear that the non-moving party had disclosed the individuals, the moving party had the opportunity to depose them, and "[t]he declarations simply explain[ed] the technical process surrounding the downloads that [the] [p]laintiffs produced in discovery").

### ii.  The Schwimmer Statement

NWS also moves to strike "the statement of Martin B. Schwimmer that their firm has never been advised by any representative of Plaintiff that . . . Coyne would be available for a deposition."  (Pl.'s Strike Mem. 5; *see also* Schwimmer Decl. II ¶ 17.)  The only apparent basis for the motion is that NWS contests the accuracy of Mr. Schwimmer's statement.  (*See id.* at 2.)  Accordingly, NWS's Motion to strike Schwimmer's statement is denied.

### B. Motions for Summary Judgment

#### 1.  Standard of Review

Summary judgment shall be granted where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland*

*Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  Additionally, "[i]t is the

movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800

Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved

Funding Corp.,* No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is

sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential

element of the nonmovant's claim," in which case "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment."  *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir.

2013) (alteration and internal quotation marks omitted).  Further, "[t]o survive a [summary

judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility

that his allegations were correct; he need[s] to 'come forward with specific facts showing that

there is a genuine issue for trial,'" *Wrobel v. Cty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012)

(emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings,"

*Walker v. City of N.Y.*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014)

(internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir.

2009) ("When a motion for summary judgment is properly supported by documents or other

evidentiary materials, the party opposing summary judgment may not merely rest on the

allegations or denials of his pleading . . . .")).

　　　　"On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law."  *Royal Crown Day Care LLC v. Dep't of Health & Mental

*Hygiene of City of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At

summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess

whether there are any factual issues to be tried."  *Brod,* 653 F.3d at 164 (internal quotation marks

omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No.

1358, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same).  Thus, a court's goal

should be "'to isolate and dispose of factually unsupported claims.'"  *Geneva Pharm. Tech. Corp.*

*v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S.

317, 323–24 (1986)); *see also Shamrock Power Sales, LLC v. Scherer*, No. 12-CV-8959, 2015

WL 5730339, at *20 (S.D.N.Y. Sept. 30, 2015) (same).

### 2. NWS's Claims Against NameMedia

#### a.  Federal Trademark Dilution

NWS alleges that NameMedia's use and registration of "newworldsolutions.com" has

"diluted the distinctive quality of the commercially valuable mark New World Solutions" in

violation of the FTDA.  (FAC ¶¶ 25–27.)

#### i.  Applicable Law

"Federal law allows the owner of a 'famous mark' to enjoin a person from using 'a mark

or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment

of the famous mark.'"  *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 110–11 (2d Cir. 2010) (quoting

15 U.S.C. § 1125(c)(1)); *see also Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198,

205 (2d Cir. 2013) (same).  "Prior to October 2006, the federal anti-dilution statute, known then

as the [Federal Trade Dilution Act of 1996 ('FTDA')], entitled the owner of a famous mark to

injunctive relief if another person's commercial use in commerce of a mark or trade

name . . . causes dilution of the distinctive quality of the famous mark." *Burberry Ltd. v. Euro Moda, Inc.*, No. 08-CV-5781, 2009 WL 1675080, at *8 (S.D.N.Y. June 10, 2009) (second alteration in original) (some alterations, emphasis, and internal quotation marks omitted).  "The FTDA provided that the owner of a famous mark 'shall be entitled only to injunctive relief . . . unless the person against whom the injunction is sought willfully intended to trade on the owner's reputation or to cause dilution of the famous mark.  If such willful intent is proven, the owner of the famous mark shall also be entitled to,'" among other things, monetary relief.  *Id.* (alteration in original) (emphasis omitted) (quoting 15 U.S.C. § 1125(c)(2) (2000)).  To establish a violation of the FTDA, a plaintiff must show that: "(1) its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 118 (2d Cir. 2006) (internal quotations omitted); *see also Savin Corp. v. Savin Grp.*, 391 F.3d 439, 448–49 (2d Cir. 2004) (same).

On October 6, 2006, President Bush signed into law the Trademark Dilution Revision Act of 2006 (the "TDRA"), which amended the FTDA "to clarify that the owner of a famous mark seeking an injunction need prove only that the defendant's mark 'is likely to cause dilution of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.'" *Starbucks Corp.*, 736 F.3d at 202 (alteration omitted) (quoting 15 U.S.C. § 1125(c)(1)); *see also Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 306–08 & n.87 (S.D.N.Y. 2007) (same).  The TDRA applies to a claim filed before the statute went into effect "to the extent that [the plaintiff] has sought injunctive relief on the issue of

43

dilution." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 477 F.3d 765, 766 (2d Cir. 2007) (per

curiam); *see also Burberry Ltd.*, 2009 WL 1675080, at *9 (same); *Dan-Foam A/S*, 500 F. Supp.

2d at 306 n.87 (same).  "[A]ctual dilution under [FTDA standards] still applies when a pre-

October 6, 2006 claimant seeks monetary relief."  *Dan-Foam A/S*, 500 F. Supp. 2d at 308.

　　　　As relevant here, under both the FTDA and TDRA, "a trademark owner

must . . . demonstrate that its mark is famous or 'widely recognized by the general consuming

public of the United States as a designation of source of the goods or services of the mark's

owner.'"  *Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 380 (S.D.N.Y. 2008)

(quoting 15 U.S.C. § 1125(c)(2)(A)).  Indeed, "[w]hile the TDRA reconfigured the factors used

by courts to evaluate fame, the Second Circuit's requirement that the senior mark must be truly

famous before a court will afford the owner of the mark the vast protections of the FTDA remains

unchanged."  *Id.* at 380–81 (alteration and internal quotation marks omitted).  In particular, "to

sustain a claim under the FTDA [or the TDRA] . . . a plaintiff must show that the senior mark

possesses both a significant degree of inherent distinctiveness and, to qualify as famous, a high

degree of acquired distinctiveness."  *Savin Corp.*, 391 F.3d at 449 (alteration, emphasis, and

internal quotation marks omitted); *see also George Nelson Found. v. Modernica, Inc.*, 12 F. Supp.

3d 635, 647–48 (S.D.N.Y. 2014) (same).  It is important to emphasize that, "[a]lthough a plaintiff

must show a preponderance of evidence on each element of a claimed violation of the FTDA in

order ultimately to prevail on such a claim . . . the element of fame is the key

ingredient[,] . . . because . . . the [prerequisite] that most narrows the universe of potentially

successful claims is the requirement that the senior mark be truly famous before a court will

afford the owner of the mark the vast protections of the FTDA [or TDRA]."  *Savin Corp.*, 391

F.3d at 449 (citation omitted).  Accordingly, "a plaintiff owning only less-than-famous marks will receive no protection under the FTDA, even if that plaintiff can prove that the use of an identical junior mark has in fact lessened the capacity of the senior mark to identify and distinguish the plaintiff's goods or services—i.e., that actual dilution has occurred."  *Savin Corp.*, 391 F.3d at 449 n.5.  To aid in this inquiry, 15 U.S.C. § 1125(c)(2) provides that:

> [T]he court may consider all relevant factors, including the following:
>
> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
>
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
>
> (iii) The extent of actual recognition of the mark.
>
> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register."

15 U.S.C. § 1125(c)(2); *see also George Nelson Found.*, 12 F. Supp. 3d at 648 (same).

### ii.  Application

For the purpose of its Motion for Summary Judgment on NWS's FTDA claim, NameMedia concedes that it makes commercial use of "www.newworldsolutions.com."  (Def.'s Mem. in Supp. of its Mot. for Summ. J. ("Def.'s Summ. J. Mem.") 14 (Dkt. No. 72).)  NameMedia's principal argument in support of the Motion is that "no rational trier of fact could find that Plaintiff's mark was famous . . . in 2005 when NameMedia registered the Domain Name."  (*Id.* at 15.)

To begin, the TDRA applies to the pre-October 6, 2006 conduct to the extent that Plaintiff seeks injunctive relief and not monetary damages.  *See Burberry Ltd.*, 2009 WL 1675080, at *9.

As the crux of the Court's analysis turns on whether the Mark was famous at the time of Defendant's conduct, however, this distinction is largely irrelevant.  To the extent that NWS argues that it has "no duty to show that the mark was famous at the time of registration in order to prevail on their claim," (Pl.'s Summ. J. Mem. 5–6), this is incorrect.  As the case law cited above makes clear, a party must show that its mark is famous to invoke the protection of the FTDA. Indeed, it bears repeating that "fame is the key ingredient" in a federal dilution claim.  *Savin*, 391 F.3d at 449.  Plaintiff's citation to *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489 (2d. Cir. 2000) is inapposite as to whether Plaintiff needs to show that the Mark was famous for the purpose of establishing a claim under the FTDA.  (Pl.'s Summ. J. Mem. 5–6.)  In *Sporty's Farm*, the Second Circuit explained that the Anticybersquatting Consumer Protection Act ("ACPA") distinguishes between "distinctiveness" and "fame" and protects both distinctive and famous marks.  *Sporty's Farm*, 202 F.3d at 497.  In other words, while the FTDA "protects marks that are both famous and distinctive from dilution, a mark needs only one of those qualities to merit protection under the ACPA," which is discussed in more detail below.  *Prime Publishers, Inc. v. American-Republican, Inc.*, 160 F. Supp. 2d 266, 277 (D. Conn. 2001); *see also George Nelson Found.*, 12 F. Supp. 3d at 648 ("The threshold finding of distinctiveness . . . is a necessary, but not sufficient, element of fame [under the FTDA]." (first alteration in original) (internal quotation marks omitted)).[21]

---

[21] In any event, while the ACPA covers "distinctive" marks as well as "famous" marks, it applies only to marks that are "famous" or "distinctive" "*at the time of registration of the domain name*."  15 U.S.C. §§ 1125(d)(1)(A)(ii)(I) and (II) (emphasis added).

NWS also argues that the "fame of the mark at the time of registration is an issue in dispute for a jury to decide" because "Plaintiff has testified that the mark was in use since 2004, but that due to a hard drive crash, the records prior to 2007 were lost."  (Pl.'s Summ. J. Mem. 5.) Drawing all inferences in NWS's favor, there is no basis in the record to find that, in March of 2005, the Mark was famous for the purposes of the federal dilution claim.  Plaintiff relies solely on Neal's deposition testimony to establish the existence and extent of NWS's promotional and business activities in 2004 and 2005.  However, as described above, it is undisputed that there is *no* documentary evidence of the existence of the d/b/a entity or of its alleged promotional activities in 2004 and 2005.  (Def.'s 56.1 ¶ 29; Pl.'s 56.1 ¶ 29.)  As Defendant argues, it is frankly implausible that *all* documentary evidence of the existence and activities of the alleged d/b/a entity could have been contained on a single hard drive and destroyed when that hard drive crashed in 2007, and that there is not a single hard copy of a single document that supports Plaintiff's assertions on this point.  (*See* Def.'s Summ. J. Reply 9.)  Moreover, it is worth noting the inconsistencies and gaps in Neal's account of the d/b/a entity and its use of the Mark in 2004, which include the following assertions: (1) Neal worked full-time for NWS in 2004 but also worked full-time for two other companies and, between 2004 and 2007, received paychecks from Bach Consulting, another company also owned by Coyne, (Neal Tr. 34, 257–60, 268–71); (2) Neal worked "on an exclusive basis" for one NWS client and also worked for other NWS clients, (*id.* at 271); (3) Neal and Coyne performed services using the name "New World Solutions" beginning in 2004, (*see, e.g.*, *id.* at 27–28), but listed June 21, 2007 as the date of "first use" on their application to register the Mark with the USPTO, (Schwimmer Decl. I Ex. 18).  These inconsistencies, coupled with the lack of any corroborating evidence and Plaintiff's discovery

practice, described above, make Neal's testimony, and NWS's sole reliance on it, at the very least, highly suspect.  *See Jeffrey's v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("[I]n the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff' and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account." (citation omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

Even considering Neal's testimony as true, there is no evidence that the Mark was "famous" prior to 2007 for the purpose of invoking protection under the FTDA.  Neal testified that, in 2004, NWS made no "systemic telemarketing effort," that its promotional activities consisted solely of "one-on-one techniques"—i.e. cold calls and e-mails from Coyne and Neal— and mailing postcards, and that NWS "didn't really formalize the [marketing] process until 2008, 2009, something like that."  (Neal Tr. 30–31, 89.)  This is not a case, then, where "publication in well-known national magazines supports a showing [that] the mark is famous."  *George Nelson Found.*, 12 F. Supp. 3d at 649 (explaining that the plaintiff, as the plaintiff in *Savin*, "point[ed] to specific publications and allege[d] the national, and even global, renown of the marks").  Moreover, Plaintiff did not maintain a website in 2004, and Neal testified that he directed potential clients to the domain name "ShaunNeal.com."  (Neal Tr. 39, 51–52.)  Neal described three clients for whom NWS performed services in 2004: Merrill Lynch, "a real estate company in Arizona," and "a client who was an institutional foreign exchange trader."  (*Id.* 36–37.)  Neal also testified that the d/b/a entity generated "a few hundred thousand" in revenue in 2004 and "over a million" in 2005 and 2006, but that any revenue would have been reported as part of

Neal's personal income tax and that NWS first filed a tax return in its own name in 2008.  (*Id.* at 91, 147–48.)  Even accepting Neal's representation of NWS's revenue in these years as true, however, this revenue generation, without more, does not support an inference that the Mark is or was famous.  *See TCPIP Holding Co. v. Haar Commc'ns Inc.*, 244 F.3d 88, 99–100 (2d. Cir. 2001) (vacating a preliminary injunction under the FTDA because $280 million in revenue and "tens of millions" of dollars spent in advertising was insufficient to show fame because there was no evidence of "how many millions, when expended, or how effectively," nor was there evidence of press accounts, consumer surveys, or other evidence of fame).  Indeed, "courts generally have limited famous marks to those that receive multi-million dollar advertising budgets, generate hundreds of millions of dollars in sales annually, and are almost universally recognized by the general public."  *Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 48 F. Supp. 3d 675, 702 (S.D.N.Y. 2014) (collecting cases), *reconsideration denied by* 2014 WL 6860294 (S.D.N.Y. Dec. 5, 2014).

Finally, NWS offers no evidence of "actual recognition of the [M]ark" prior to 2007, let alone that the Mark was "widely recognized."  15 U.S.C. § 1125(c)(2)(A).[22]  Rather, the evidence is that the Mark was not registered when Defendant acquired the Domain Name and the business activities of NWS, if any, were minimal.  In short, construing NWS's evidence in the most favorable light, none of the factors set forth in 11 U.S.C. § 1125(c)(2) remotely suggest the Mark

---

[22] Neal testified that he was "not aware" of any newspaper, television, radio, or other media coverage of NWS prior to March 2005 (or in 2012).  (Neal Tr. 82–84.)  Further, when asked in his deposition "How does someone learn the word 'New World Solutions' in 2004?," Neal answered, "One of our sales people would get a calling list of profile clients and would get on the phone and say we sell outsourcing services.  We sell technology consulting.  We sell whatever kind of particular niche technology we may have been offering at the time.  Are you interested in having a conversation about this . . . ."  (*Id.* at 90–91.)

was "famous" when NameMedia acquired the Domain Name, especially given that marks

"qualify as 'famous' only if they carr[y] a substantial degree of fame." *TCPIP Holding Co.*, 244

F.3d at 99.[23]  Indeed, NWS offers no evidence, let alone "more than a mere scintilla of evidence,"

*Savin Corp.*, 391 F.3d at 450 (internal quotation marks omitted), that the Mark was famous prior

to 2007.  *See GMA Accessories, Inc. v. Croscill, Inc.*, No. 06-CV-6236, 2008 WL 591803, at *10

(S.D.N.Y. Mar. 3, 2008) (explaining that it was "patently clear . . . that [the plaintiff's] mark

[was] not sufficiently famous to qualify for protection under the TDRA" where the plaintiff could

not "calculate its promotional expenditures with any specificity or detail, and the only

quantifiable evidence in the record reflect[ed] a mere $17,000 in advertising . . . over the entire

eleven-year life of the mark," the sales revenue averaged less than $3 million per year, and there

was no evidence of any consumer recognition of the mark); *S&L Vitamins, Inc. v. Australian

Gold, Inc.*, 521 F. Supp. 2d 188, 211 (E.D.N.Y. 2007) (explaining that although the claimant

submitted "that 50% to 60% of the 25,000 tanning salons in the United States carry one of their

tanning [p]roducts, . . . [its] [p]roducts comprise approximately 20% to 40% of [a retailer's]

overall sales of tanning products," the claimant did "not offer any evidence indicating significant

expenditures on advertising, extent of advertising, or annual revenues" and, therefore, concluding

that there was not "more than a mere scintilla of evidence of fame" (internal quotation marks

---

[23] In addition, "[i]n general, the degree of fame required for protection under the [TDRA] must exist in the general marketplace, not in a niche market.  Thus, fame limited to a particular channel of trade, segment of industry or service, or geographic region is not sufficient to meet that standard." *Malletier*, 561 F. Supp. 2d at 380 (internal quotations omitted).  Neal testified that media coverage was "not something that we would even look for" because "we're not selling toothpaste . . . we're selling technology consulting services to large multinational companies." (Neal Tr. 84.)

omitted)); *cf. Schutte Bagclosures Inc.*, 48 F. Supp. 3d at 702–03 (holding that the plaintiff had "raise[d] at least an issue of fact with respect to fame necessary to avoid summary judgment" where the plaintiff had a registered trademark, sold five to six billion bags per year, spent millions of dollars in advertising, and pointed to specific publications and circulation of product brochures and catalogs, among other things).  Because there is no genuine dispute of material fact, then, that the Mark was not famous for purposes of the federal dilution claim when NameMedia registered the Domain Name, Defendant's Summary Judgment Motion on this claim is granted.  *See Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 472 (E.D.N.Y. 2009) (granting the motion to dismiss the FTDA claim where "there [was] no evidence to indicate that the 'Moscow Cats Theater' mark [was] 'truly famous'"); *GMA Accessories, Inc.*, 2008 WL 591803, at *10 (dismissing the TDRA claim because there was not a sufficient showing that the mark was famous).

### b. Cybersquatting

NWS also alleges that NameMedia's registration and use of "newworldsolutions.com" violates the ACPA.  (FAC ¶¶ 28–33.)

### i.  Applicable Law

The ACPA was "passed to remedy the perceived shortcomings of applying the FTDA in cybersquatting cases," and "create[s] a specific federal remedy for cybersquatting."  *Sporty's Farm*, 202 F.3d at 496.  The ACPA provides that:

> A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person—
>
> (i) has a bad faith intent to profit from that mark . . . ; and
>
> (ii) registers, traffics in, or uses a domain name that—

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

(III) is a trademark, word, or name protected by [provisions related to the Red Cross and the United States Olympic Committee].

15 U.S.C. § 1125(d)(1)(A).  "To make out a cybersquatting claim, courts in [the Second Circuit] consider (1) whether the mark is distinctive or famous; (2) whether the domain name is identical or 'confusingly similar' to the mark; and (3) whether the domain name registrant acted with a 'bad faith intent to profit' from the mark when it registered the domain name." *Kuklachev*, 600 F. Supp. 2d at 472 (*citing Sporty's Farm*, 202 F.3d at 497–99); *see also Dudley v. HealthSource Chiropractic, Inc.*, 585 F. Supp. 2d 433, 438 (W.D.N.Y. 2008) (same).

Pursuant to the first prong, "[d]istinctiveness refers to inherent qualities of a mark and is a completely different concept from fame.  A mark may be distinctive before it has been used—when its fame is nonexistent.  By the same token, even a famous mark may be so ordinary[] or descriptive as to be notable for its lack of distinctiveness." *Sporty's Farm*, 202 F.3d at 497. "Marks are classified, in ascending order of strength, as (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 384–85 (2d Cir. 2005) (alteration and internal quotation marks omitted).  Generic marks are "those consisting of words identifying the relevant category of goods or services," and are "not at all distinctive and thus are not protectable under any circumstances." *Id.* at 385.  "Descriptive marks are those consisting of words identifying qualities of the product," and while they are not inherently distinctive, they "are protectable provided they have acquired secondary meaning." *Id.*

"Suggestive marks are those that are not directly descriptive, but do suggest a quality or qualities of the product, through the use of imagination, thought[,] and perception." *Id.* (citation and internal quotation marks omitted). "Arbitrary or fanciful marks are ones that do not communicate any information about the product either directly or by suggestion." *Id.* Both suggestive marks and arbitrary or fanciful marks "are each inherently distinctive." *Id.*; *see also CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 150 (E.D.N.Y. 2011) (explaining, that "[c]ourts in the Second Circuit determine whether a mark is distinctive—and thus entitled to protection—with reference to the classification scheme developed by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976) [which] classifies marks along a four-category spectrum, as (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful" (citations omitted)); *Dudley*, 585 F. Supp. 2d at 438 (applying the *Star Industry* categories of distinctiveness to determine whether a Mark was distinctive for purposes of the ACPA).

Pursuant to the second prong, the "confusingly similar" standard under the ACPA is different from the "'likelihood of confusion' standard for trademark infringement," and "whether a domain name is confusingly similar to a trademark is to be evaluated without regard to the goods or services of the parties." *Dudley*, 585 F. Supp. 2d at 440 (some internal quotation marks omitted). Finally, the ACPA provides a list of non-exhaustive factors to consider in determining whether there is "bad faith intent" to profit from a mark. In particular, a court may consider such factors as:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B).  However, "[b]ecause the ACPA has the potential to encompass a broad array of online conduct, courts are 'reluctant to interpret the ACPA's liability provisions in an overly aggressive manner,' . . . [which] is particularly true of the bad faith intent to profit requirement," and, therefore, "a number of courts—including the Second Circuit—have departed from strict adherence to the statutory indicia and relied expressly on a more case-specific

approach to bad faith." *Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 432–33

(S.D.N.Y. 2013) (quoting *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th

Cir. 2001)); *see also Sporty's Farm*, 202 F.3d at 498–99 (applying the statutory factors and other

considerations "which do not fit neatly into the specific factors enumerated by Congress" to

determine whether there was bad faith intent to profit). Therefore, "[a] court must analyze each

case based on its unique circumstances to determine how close a defendant's conduct falls to the

ACPA's heartland—the clearest example of which is the situation where a defendant registers an

established entity's domain name in bad faith and offers to sell it to the entity for an exorbitant

price." *Gench v. HostGator.com LLC*, No. 14-CV-3592, 2015 WL 569154, at *7 (S.D.N.Y. Feb.

11, 2015) (citation and internal quotation marks omitted), *adopted by* 2015 WL 1054968

(S.D.N.Y. Mar. 10, 2015). Another "quintessential example[]" of bad faith is "where a defendant

intends to profit by diverting customers from the website of the trademark owner to the

defendant's own website, where those customers would purchase the defendant's products or

services." *Gioconda Law Grp.*, 941 F. Supp. 2d at 434 (alteration and internal quotation marks

omitted).

### ii.  Application

Defendant argues that Plaintiff cannot establish the first prong of an ACPA claim because

there is no evidence that, in March of 2005, the Mark was famous or distinctive, or even that it

existed. Indeed, Plaintiff has not proffered sufficient evidence to create a genuine issue of

material fact as to whether the Mark existed, or in other words was in use, in 2005. A threshold

requirement of the ACPA is that the plaintiff is "the owner of a mark." *Mont. Jewelry, Inc. v.

Risis*, No. 11-CV-4875, 2013 WL 1232324, at *3 (E.D.N.Y. Mar. 26, 2013) (citing 15 U.S.C.

§ 1125(d)(1)(A)).  A service mark exists by virtue of its use in commerce.  *See Am. Express v. Goetz*, 515 F.3d 156, 161 (2d Cir. 2008) ("[T]here can be no trademark absent goods sold and no service mark without services rendered. . . . [I]t cannot be said that a service mark is actually used if it is displayed in an advertisement for services that are non-existent or will only hypothetically be available at some point in the future.").  In other words, "[o]wnership of a mark arises from a party's prior use of the mark to identify its goods or services in a given market." *Mont. Jewelry, Inc.*, 2013 WL 1232324, at *3 (citing *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007) ("[S]o long as a person is the first to use a particular mark to identify his goods or services in a given market, and so long as that owner continues to make use of the mark, he is entitled to prevent others from using the mark to describe their own goods in that market." (internal quotation marks omitted))); *see also See Am. Online Latino v. Am. Online, Inc.*, 250 F. Supp. 2d 351, 360 (S.D.N.Y. 2003) ("[O]wnership rights flow only from prior use . . . ."  (second alteration in original) (emphasis omitted) (quoting 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 16:18 (4th ed. 2002))), *opinion clarified by* 2003 WL 1842874 (S.D.N.Y. Apr. 2, 2003).  Nevertheless, it is important to note that "[t]he ACPA requires only that a plaintiff be the 'owner' of a mark; it does not require the mark to be registered." *Mont. Jewelry, Inc.*, 2013 WL 1232324, at *3 (citing 15 U.S.C. § 1125(d)(1)(A) and *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 205 (6th Cir. 2004) ("A trademark need not be registered to be entitled to protection under [15 U.S.C. § 1125(d)].")).

Although Plaintiff contends that Neal's deposition testimony establishes that the Mark was "in use" prior to 2007, (Pl.'s Summ. J. Mem. 6), Plaintiff offers no evidence, besides Neal's testimony, to support this claim.  Indeed, it is undisputed that there is no documentary evidence

that supports the Mark existed prior to 2007.  As Defendant argues, Neal's unsubstantiated and self-serving testimony is insufficient, without more, to defeat summary judgment.  *See Brusso v. Imbeault*, 699 F. Supp. 2d 567, 583 (W.D.N.Y. 2010) ("[A] plaintiff's deposition testimony alone is insufficient to defeat a motion for summary judgment."); *Wurtzel v. Starbucks Coffee Co.*, 257 F. Supp. 2d 520, 525 (E.D.N.Y. 2003) (explaining that the opposing party could not rely upon speculation or conjecture in opposing the motion for summary judgment); *Palmer v. Circuit Court of Cook Cty., Social Serv. Dep't*, 905 F. Supp. 499, 505 (N.D. Ill. 1995) ("[U]nsubstantiated and self-serving testimony . . . is simply not sufficient under [the summary judgment rule] to create a genuine issue of material fact and defeat an otherwise properly supported motion for summary judgment where there is no other corroborating evidence in the record to support th[e] statement."), *aff'd sub nom. Palmer v. Circuit Court of Cook Cty., Ill.*, 117 F.3d 351 (7th Cir. 1997).

Fatal to Neal's assertion is NWS's June 28, 2010 Application to the USPTO, wherein NWS described the services it provides as "[c]omputer hardware and software consulting services; [i]nformation technology consultation; [s]ervices for maintenance of computer software; [s]oftware design and development" and stated that its first use of the Mark, and its first use of the Mark in commerce, occurred "at least as early as 6/21/2007."  (Schwimmer Decl. I Ex. 18.)  This undercuts any claim that the Mark was in use in 2005.  *Cf. Web-adviso v. Trump*, 927 F. Supp. 2d 32, 39 (E.D.N.Y. 2013) (explaining that prior to the plaintiff registering the domain names in 2007, the defendant "attested to the USPTO that the TRUMP mark was incontestable when used in hotel services, bottled water[,] and golf club services, because [the] [d]efendant had registered and continuously used the mark in connection with these goods and services for at least five

years" and the USPTO "accepted and acknowledged [the] [d]efendant's attestation").  Without

establishing that the Mark was in use at the time of Defendant's conduct, there can be no ACPA

claim.  *See Am. Online Latino*, 250 F. Supp. 2d at 360 (explaining that "[i]n view of [the]

plaintiff's admission that he owned no trademark, and as he indisputably was not the senior user,

he cannot state a claim for relief under the ACPA").  Accordingly, Plaintiff has failed to present

evidence showing that there is a genuine issue for trial as to whether the Mark was in use in 2005,

when Defendant obtained the Domain Name.

      Plaintiff's claim under the ACPA also fails under the third prong—that Defendant acted in

bad faith with an intent to profit from Plaintiff's Mark.  Defendant's activity as to the Domain

Name does not fall within any of the "quintessential examples" of bad faith that courts have

acknowledged.  There can be no claim that Defendant "purchase[d] [the] [D]omain [N]ame very

similar to the [Mark] and then offer[ed] to sell the name to [Plaintiff] at an extortionate price,"

*Gioconda Law Grp.*, 941 F. Supp. 2d at 434 (quoting *Utah Lighthouse Ministry v. Found. for*

*Apologetic Info. & Research*, 527 F.3d 1045, 1058 (10th Cir. 2008)), because there is absolutely

no viable evidence that the Mark was in use in 2005, for the reasons described above.  Nor is this

a case where Defendant "intend[ed] to profit by diverting customers from the website of the

trademark owner to [Defendant's] own website, where those consumers would purchase

[Defendant's] products or services instead of [Plaintiff's]."  *Id.* (quoting *Utah Lighthouse*

*Ministry*, 527 F.3d at 1058).  Indeed, there is no evidence that Plaintiff had an online presence

until at least 2007, (*cf.* Pl.'s Resps. to Def.'s First Set of Interrogs. No. 16 (describing the websites

that Plaintiff owns, "which were purchased between August 2, 2007 and September 26, 2011")),

and, accordingly, as Defendant points out, it "could not have had a bad faith intent (or any intent)

to divert Internet traffic from Plaintiff when Plaintiff had no Internet traffic to divert," (Def.'s Summ. J. Mem. 13). *Cf. Lewittes v. Cohen*, No. 03-CV-189, 2004 WL 1171261, at *8 (S.D.N.Y. May 26, 2004) (explaining that because there were "no facts in the [c]omplaint that support an allegation that [the] plaintiff ha[d] his own website[,] . . . it is no surprise that there [were] no facts to support any allegation that [the] defendants intended to divert business from any site the plaintiff might maintain"). Additionally, Plaintiff has offered no admissible evidence that Defendant currently diverts customers or traffic from Plaintiff's website. The Court acknowledges that the fact that NameMedia "offers a marketplace for purchase and sale of domain names by and for others and also purchases and sells domain names for its own accounts," (Def.'s 56.1 ¶ 72; Pl.'s 56.1 ¶ 72), "monetizes" some of its domain names, (Def.'s 56.1 ¶ 74; Pl.'s 56.1 ¶ 74), and boasts of an inventory of more than 900,000 domains, (Pl.'s 56.1 ¶ 81; Def.'s Reply 56.1 ¶ 81), could perhaps, in other circumstances, support a finding of bad faith, especially in light of the statutory factors a court may consider in making this determination. The circumstances of this case, however, do not support such a finding in the absence of evidence that NWS even existed prior to 2005. Summary judgment on the ACPA claim is warranted because Plaintiff has proffered no genuine evidence that at the time of registration of the Domain Name the Mark was in use and there is likewise no evidence that Defendant possessed the requisite "bad faith intent to profit" from the Mark.

### c. Trademark Dilution under NYGBL §360-l

NameMedia also seeks summary judgment as to Plaintiff's trademark dilution claim, brought pursuant to NYGBL § 360-l. (*See* FAC ¶¶ 39–44.)

i.  Applicable Law

NYGBL §360-l provides that "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."  To succeed on a claim for trademark dilution under NYGBL § 360-l, "a plaintiff must prove (1) that it possesses a strong mark, one which has a distinctive quality or has acquired a secondary meaning such that the trade name has become so associated in the public's mind with the plaintiff that it identifies goods sold by that entity as distinguished from goods sold by others, and (2) a likelihood of dilution by either blurring or tarnishment." *Gucci Am., Inc. v. Guess?, Inc.,* 868 F. Supp. 2d 207, 241 (S.D.N.Y. 2012).  "Under section 360-l—unlike federal law, the plaintiff's mark 'need not be . . . famous or celebrated, but it must be an extremely strong mark either because of its inherently distinctive qualities or the fact that it has acquired secondary meaning.'"  *Mobileye, Inc. v. Picitup Corp.*, 928 F. Supp. 2d 759, 782 (S.D.N.Y. 2013) (quoting *Energy Intelligence Grp., Inc. v. UBS Fin. Servs., Inc.*, No. 08-CV-1497, 2009 WL 1490603, at *6 (S.D.N.Y. May 22, 2009)).  In other words, distinctiveness for the purpose of trademark dilution claims under New York state law "has been equated with the strength of a mark for infringement purposes."  *Johnson & Johnson Consumer Cos. v. Aini*, 540 F. Supp. 2d 374, 394 (E.D.N.Y. 2008) (quoting *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir. 1989)); *see also CommScope, Inc. of N.C. v. Commscope (U.S.A.) Int'l Grp. Co.*, 809 F. Supp. 2d 33, 39 (N.D.N.Y. 2011) (same); *Fireman's Ass'n of N.Y. v. French Am. Sch. of N.Y.*, 839 N.Y.S.2d 238, 241–42  (App. Div. 2007) (noting

that to prevail on a dilution claim under NYGBL §360-l, a plaintiff must demonstrate that it

"possess[es] a strong mark—one which has a distinctive quality or has acquired a secondary

meaning such that the trade name has become so associated in the public's mind with the

[plaintiff] that it identifies goods sold by that entity as distinguished from goods sold by others"

(first alteration in original) (citation and internal quotation marks omitted)).  Indeed, "[t]he

Second Circuit has . . . held that § 360-l 'protects only extremely strong marks.'"  *Johnson &*

*Johnson v. Azam Int'l Trading*, No. 07-CV-4302, 2013 WL 4048295, at *10 (E.D.N.Y. Aug. 9,

2013) (quoting *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1049 (2d Cir.

1992)); *see also GMA Accessories, Inc.*, 2008 WL 591803, at *11 (same).

"To gauge a mark's strength, [courts] consider two factors: its inherent distinctiveness,

and its distinctiveness in the marketplace."  *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739,

743 (2d Cir. 1998).  "The second element a plaintiff must establish [under NYGBL § 360-l] is

likelihood of dilution," which is defined "as either the blurring of a mark's product identification

or the tarnishment of the affirmative associations a mark has come to convey."  *Johnson &*

*Johnson*, 2013 WL 4048295, at *10 (quoting *Mead Data Cent.*, 875 F.2d at 1031).

## ii.  Application

Plaintiff's claim under NYGBL § 360-l fails under the first prong.  Here, even assuming

that NWS's mark has an inherent distinctiveness, "the total lack of any evidence of commercial

recognition of the mark demonstrates that it is a relatively weak mark in the place where it counts:

the marketplace."  *GMA Accessories, Inc.*, 2008 WL 591803, at *11 (alteration and internal

quotation marks omitted); *see also SLY Magazine, LLC v. Weider Publ'ns L.L.C.*, 529 F. Supp. 2d

425, 443 (S.D.N.Y. 2007) (explaining that "[a]lthough [the] [p]laintiff['']s mark is inherently

distinctive . . . it is nonetheless a weak mark and does not merit protection under § 360-l"), *aff'd*, 346 F. App'x 721 (2d Cir. 2009).  For the reasons discussed above, Plaintiff has failed to proffer any evidence that the Mark had recognition, or even was in use prior to 2007, and has not pointed to specific evidence that the Mark has recognition in the marketplace today.  Moreover, it is undisputed that there are six other companies in the marketplace—at least one of which was established in 1996, before the d/b/a/ entity was allegedly established—with the name "New World Solutions."  (Def.'s 56.1 ¶¶ 59–64; Pl.'s 56.1 ¶¶ 59–64.)  "Such third party use of the[se] words . . . weakens the strength of [Plaintiff's] [M]ark."  *Streetwise Maps, Inc.*, 159 F.3d at 744 (explaining that the name "Streetwise" was "not particularly distinctive in the marketplace" because "[o]ther map manufacturers have used the word 'street' in their product[s]" and "a trademark search revealed the extensive use of the words 'street' and 'wise' in names registered by manufacturers of other products"); *see also SLY Magazine LLC*, 529 F. Supp. 2d at 443 (explaining that the "[p]laintiff picked an already diluted name . . . as the mark for its magazine for women, so the scope of the protection to which it is entitled is not as broad as that which might be accorded to a strong, coined name, as Kodak, for instance" (internal quotation marks omitted)).  Because the Mark is not "distinctive" for purposes of NYGBL §360-l, summary judgment in favor of NameMedia is warranted.

### d. Deceptive Acts and False Advertising under NYGBL §§ 349 and 350

NameMedia also moves for summary judgment on Plaintiff's claims under NYGBL §§ 349 and 350.  (*See* FAC ¶¶ 34–38.)

i.  Applicable Law

NYGBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."[24]  NYGBL § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."[25]  "A plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act."  *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000); *see also RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14-CV-6294, 2015 WL 5008762, at *3 (S.D.N.Y. Aug. 24, 2015) (same); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409 (S.D.N.Y. 2015) (same); *Leider v. Ralfe*, 387 F. Supp. 2d 283, 292 (S.D.N.Y. 2005) (applying this standard to both NYGBL §§ 349 and 350).  "To aid in the interpretation of the second element, the New York Court of Appeals has instructed that a deceptive act or practice has an 'objective definition,' whereby deceptive acts or practices— which may be acts or omissions—are 'limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances.'"  *Id.* at 292 (quoting *Oswego Laborers' Local 214*

---

[24]  The statute authorizes individuals who are "injured by reason of any violation of" § 349 to bring an action for an injunction and/or "actual damages or fifty dollars, whichever is greater." NYGBL § 349(h).  If a court finds the defendant willfully or knowingly violated § 349, the court has discretion to increase the damages award "to an amount not to exceed three times the actual damages up to one thousand dollars."  *Id.*

[25]  Individuals who are injured by reason of any violation of NYGBL § 350 are authorized to bring an action for an injunction and/or for "actual damages or five hundred dollars, whichever is greater."  NYGBL § 350-e.  If a court finds the defendant willfully or knowingly violated § 350, the court has discretion to increase the damages award "to an amount not to exceed three times the actual damages, up to ten thousand dollars."  *Id.*

*Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995)); *see also Goshen v Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195 (N.Y. 2002) (same).  In other words, a violation of this section "requires that the defendant's conduct deceive a reasonable consumer in a material respect, work a harm to the public at large, and directly cause the plaintiff's injury." *Leider*, 387 F. Supp. 2d at 292.

"The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to section 349."  *Goshen*, 774 N.E.2d at 1195 n.1; *see also RCA Trademark Mgmt.*, 2015 WL 5008762, at *3 (same); *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 409 ("The same analysis [under section 349] applies to false advertising claims brought under Section 350."); *Yellow Book Sales & Distrib. Co. v. Hillside Van Lines, Inc.*, 950 N.Y.S.2d 151, 153 (App. Div. 2012) ("To successfully assert a claim under General Business Law §§ 349 or 350, a party must allege that its adversary has engaged in consumer-oriented conduct that is materially misleading, and that the party suffered injury as a result of the allegedly deceptive act or practice.").  "Additionally, neither Section 349 nor 350 require proof of reliance, . . . nor proof that defendants intended to mislead consumers."  *In re Scotts EZ Seed Litig*, 304 F.R.D. at 409 (citing, inter alia, *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675 (N.Y. 2012)).[26]   Finally,

---

[26] The Court notes that several courts have explained that "[i]n addition, § 350 requires—unlike § 349—that the plaintiff must demonstrate reliance on the allegedly false advertising," which "means that the plaintiff must 'point to [a] specific advertisement or public pronouncement' upon which he or she relied."  *Leider*, 387 F. Supp. 2d at 292 (alteration in original) (quoting *Small v. Lorillard Tobacco Co.*, 679 N.Y.S.2d 593, 600 (App. Div. 1998)) (collecting cases); *see also Zaccagnino v. Nissan N. Am., Inc.*, No. 14-CV-3690, 2015 WL 3929620, at *3 (S.D.N.Y. June 17, 2015) (same).  The New York Court of Appeals, however, has made clear that "[j]ustifiable reliance by the plaintiff is not an element of [sections 349 and 350]."  *Koch*, 967 N.E.2d at 676; *see also In re Scotts EZ Seed Litig.*, 304 F.R.D. at 409 ("[N]either Section 349 nor 350 require proof of reliance . . . ."); *Koch v. Greenberg*, 14 F. Supp. 3d 247, 262

it is worth noting that "[a]lthough not explicitly stated in the text of either provision, courts have consistently found that the gravamen of a section 349 or 350 claim is 'consumer injury or harm to the public interest.'" *Tropical Sails Corp. v. Yext, Inc.*, No. 14-CV-7582, 2015 WL 2359098, at *3 (S.D.N.Y. May 18, 2015) (quoting *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995)).  Accordingly, even though "a business may bring a claim under sections 349 and 350 where it is injured by conduct that is . . . directed at consumers or that causes harm to the public at large," a business plaintiff "must charge conduct of the defendant that is consumer oriented."  *Id.* at *3–4; *see also LBF Travel, Inc. v. Fareportal, Inc.*, No. 13-CV-9143, 2014 WL 5671853, at *10 (S.D.N.Y. Nov. 5, 2014) (report and recommendation) (explaining same).

### ii.  Application

NWS alleges that NameMedia "intends to deceive business and individual consumers into thinking that [NWS] in some way endorses or supports the activities of [] Defendant." (FAC ¶ 18.)  Plaintiff also claims that "Defendant intends to deceive business and individual consumers that [NWS] is affiliated with [] Defendant," (*id.* ¶ 20), and Defendant "falsely advertised [its] services to the public by representing that [NWS] in some way endorses or is affiliated with [NameMedia]" in violation of NYGBL §§ 349 and 350, (*id.* ¶¶ 36–37).  In its moving papers, NameMedia argues that "NWS cannot cite to any record evidence whatsoever that NameMedia's registration of the subject Domain Name was 'misleading in a material way' or that Plaintiff was 'injured' as a result of same."  (Def.'s Summ. J. Mem. 19.)  Plaintiff does not respond to

---

(S.D.N.Y. 2014) (same), *aff'd*, — F. App'x —, 2015 WL 5711578 (2d Circ. Sept. 30, 2015); *Hollander v. Metro. Transp. Auth.*, No. 160972/13, 2015 WL 4077193, at *4 (N.Y. Sup. Ct. June 25, 2015) ("Justifiable reliance is not an element of a claim under either section; a plaintiff need only show that the defendant's materially deceptive act, practice[,] or advertisement caused actual

Defendant's claims or defend its claims under NYGBL §§ 349 and 350 in its opposition papers.

"When a party 'offer[s] no response' to its opponent's motion to dismiss a claim, that claim is

abandoned."  *Paul v. Bank of Am., N.A.*, No. 11-CV-81, 2011 WL 5570789, at *2 (D. Conn. Nov.

16, 2011) (alteration in original) (quoting *Molinari v. Bloomberg*, 564 F.3d 587, 609 n.15 (2d Cir.

2009)).  Accordingly, the Court deems this claim abandoned and grants Defendant's Motion as to

these claims.  *See id.* (explaining that because the plaintiff failed to address a claim in opposition

to summary judgment, "it appears to th[e] court that he has abandoned it"); *see also Codrington v.

City of N.Y.*, No. 12-CV-1650, 2015 WL 893567, at *14 (E.D.N.Y. Mar. 2, 2015) (deeming

claims abandoned where the defendants moved for summary judgment against certain claims but

the plaintiff's opposition did not address the arguments); *Avola v. Louisiana-Pacific Corp.*, 991 F.

Supp. 2d 381, 390–91 (E.D.N.Y. 2014) (same).

      In any event, Plaintiff has failed to proffer evidence to show that there are genuine issues

of material fact as to these claims.  First, Plaintiff has failed to establish that Defendant's

registration of the Domain Name or activities associated with the Domain Name were consumer-

oriented.  "Under New York law, claims involving trademark violations are not cognizable under

N.Y. GBL §§ 349 or 350 unless 'there is a specific and substantial injury to the public interest

over and above ordinary trademark infringement or dilution.'"  *RCA Trademark Mgmt.*, 2015 WL

5008762, at *4 (quoting *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 435

(S.D.N.Y. 2012)); *see also Lifeguard Licensing Corp. v. Gogo Sports, Inc.*, No. 10–CV–9075,

2013 WL 4400520, at *8 (S.D.N.Y. Aug. 15, 2013) ("[F]or [§ 349] to apply, a plaintiff must

establish a direct harm to consumers that is greater than the general consumer confusion

_____

injury, though not necessarily pecuniary harm.").

commonly found in trademark actions . . . ." (internal quotation marks omitted)).  Even in evaluating a Rule 12(b)(6) motion, "[c]laims that arise out of a trademark infringement action, and disputes between competitors where the core of the claim is harm to another business as opposed to consumers, both constitute situations which courts have found to reflect a public harm that is too insubstantial to satisfy the pleading requirements."  *RCA Trademark Mgmt.*, 2015 WL 5008762, at *4 (quoting *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 273 (S.D.N.Y. 2003)).  Indeed, "[c]ourts have generally held that the type of injury needed to sustain a trademark violation under these provisions is limited to one 'that would trigger Federal Trade Commission intervention under 15 U.S.C. § 45, such as potential danger to the public health or safety.'"  *Id.* (quoting *DO Denim, LLC v. Fried Denim, Inc.*, 634 F. Supp. 2d 403, 409 (S.D.N.Y. 2009)).

Here, Plaintiff's allegations that Defendant "intends to deceive business and individual consumers into thinking that [NWS] in some way endorses or supports the activities of [] Defendant," (FAC ¶ 18), that "Defendant intends to deceive business and individual consumers that [NWS] is affiliated with [] Defendant," (*id.* ¶ 20), and that Defendant "falsely advertised their services to the public by representing that [NWS] in some way endorses or is affiliated with [NameMedia]" in violation of NYGBL §§ 349 and 350, (*id.* ¶¶ 36–37), "identifies no harm to the public over and above ordinary trademark infringement or dilution . . . and pleads no facts from which this Court may infer that the core of its claims is harm to the consuming public rather than

harm to its own business interests," *RCA Trademark Mgmt.*, 2015 WL 5008762, at *4 (internal

quotation marks omitted).[27]

     Second, even construing Plaintiff's evidence as support for the contention that customers

were confused by Defendant's activities in relation to the Domain Name, (*see* Pl.'s 56.1 ¶ 11),

"[c]ourts have held that a party's 'claim that consumers will be confused, on its own, does not

meet the threshold for liability' under [NYGBL] §§ 349 and 350." *RCA Trademark Mgmt.*, 2015

WL 5008762, at *5 (quoting *Philip Morris USA, Inc. v. U.S. Sun Star Trading, Inc.*, No. 08-CV-

68, 2010 WL 2133937, at *6–7 (E.D.N.Y. Mar. 11, 2010), *adopted by* 2010 WL 2160058

(E.D.N.Y. May 27, 2010)); *see also Luv N' Care, Ltd. v. Walgreen Co.*, 695 F. Supp. 2d 125, 136

(S.D.N.Y. 2010) (noting that actions alleging "only general consumer confusion" do not threaten

direct harm to consumers for purposes of stating a claim under § 349).  Accordingly,

NameMedia's motion for summary judgment on the deceptive practices and false advertising

claim is granted.

---

[27] NameMedia correctly observes that Plaintiff's allegations are unclear as to "how, exactly, consumers are harmed or mislead."  (Def.'s Summ. J. Reply 13.)  NWS alleges that, because of NameMedia's alleged keyword optimization policy "a person interested in finding New World Solutions, browses the website at www.newworldsolutions.com.  They do not find the content they are looking for, so they search for the keywords relevant to the entity they are looking for.  The defendant then actively incorporates those keywords into their website."  (Pl.'s Summ. J. Mem. 8–9.)  Even if the Court could consider NWS's keyword optimization policy allegations, and even if those allegations were taken to the logical extreme —that is, the top hits in consumer searches for NWS were NameMedia holding pages—the only result would be

### 3. NameMedia's Counterclaims against NWS

#### a. Cancellation of the Registration and Declaratory Judgment of Liability

NameMedia moves for summary judgment on its claim that the Registration should be cancelled pursuant to 15 U.S.C. § 1119, because NWS allegedly made "fraudulent representations regarding material facts to the USPTO in the course of procuring the Registration" and "could not truthfully claim use of the [M]ark prior [to May 25, 2010]."[28] (*See* Def.'s Counterclaims ¶¶ 7–22.) NameMedia also asserts that, because of NWS's allegedly fraudulent procurement of the Registration and NWS's subsequent prosecution of this Action, NWS is liable to NameMedia pursuant to 15 U.S.C. § 1120 and is entitled to an Order "for all of [NameMedia's] damages incurred as a result of [NWS's] meritless enforcement of said registration." (*Id.* ¶ 29.)[29] NWS, in turn, moves for summary judgment on these claims.

#### i.  Applicable Law

"A request for dismissal of a cancellation proceeding pursuant to section 1119 ordinarily is made as a counterclaim in an infringement action," *Empresa Cubana del Tabaco v. Culbro*

---

consumer confusion, which as is further discussed, not enough for this claim to survive summary judgment.

[28] 15 U.S.C. § 1119 provides that "[i]n any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action.  Decrees and orders shall be certified by the court to the Director, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby."

[29] 15 U.S.C. § 1120 provides that "[a]ny person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral

*Corp.*, 541 F.3d 476, 478 (2d Cir. 2008), and whether to grant relief under this statute rests within the discretion of the district court, *see id.* (explaining that the discretionary authority afforded to district courts under 15 U.S.C. § 1119 is "demonstrated by [the statute's] use of the permissive 'may' in authorizing courts to grant relief, as distinct from its use of the mandatory 'shall' in requiring any orders or decrees that are entered to be sent to and followed by the [US]PTO").  To prevail on a claim for cancellation of a federally registered trademark under 15 U.S.C. § 1119, "a plaintiff must show that (1) it has standing to bring a cancellation claim, and (2) there are valid grounds for why the registration should not continue to be registered." *Citigroup Inc. v. City Holding Co.*, No. 99-CV-10115, 2003 WL 282202, at *14 (S.D.N.Y. Feb. 10, 2003).  "A registered mark may be canceled based upon misstatements in a trademark application if the plaintiff demonstrates that the statements '(1) were made with knowledge of their falsity, and (2) were material to the determination to grant the application.'" *Audiovox Corp. v. Monster Cable Prods., Inc.*, 544 F. Supp. 2d 155, 158 (E.D.N.Y. 2008) (quoting *West Indian Sea Island Cotton Ass'n Inc. v. Threadtex, Inc.*, 761 F. Supp. 1041, 1052 (S.D.N.Y. 1991)); *see also Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 241–42 (E.D.N.Y. 2009) (same); *City of N.Y. v. Tavern on the Green, L.P.*, 427 B.R. 233, 242 (S.D.N.Y. 2010) ("In order to succeed on its petition for cancellation, [the plaintiff] must establish misstatements that indicate a deliberate attempt to mislead the [US]PTO and were with respect to a material fact—one that would have affected the [US]PTO's action on the application." (alterations, emphasis, and internal quotations omitted)).  "Stated another way, the concept of fraud upon the [USPTO] involves a willful

---

or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof."

withholding by the applicant, with intent to deceive, of material facts which, if disclosed, would result in refusal by the [USPTO] to register the mark." *Buti v. Impressa Perosa, S.R.L.*, 935 F. Supp. 458, 474 (S.D.N.Y. 1996) (internal quotation marks omitted), *aff'd*, 139 F.3d 98 (2d Cir. 1998).  "Misstatements in a registration application will result in cancellation only if the statements were made with knowledge of their falsity and were material to the decision to grant the application." *Audiovox Corp.*, 544 F. Supp. 2d at 158.  Moreover, "fraud must be proven by clear and convincing evidence." *Id.* at 158–59.

"Relief under § 1120 requires that the parties' injuries result from the use of the mark while falsely registered." *Martal Cosmetics, Ltd. v. Int'l Beauty Exch. Inc.*, No. 01-CV-7595, 2007 WL 895697, at *30 (E.D.N.Y. Mar. 22, 2007) (internal quotation marks omitted).  It is insufficient for a defendant to claim that it has "been damaged in the amount of their legal fees and costs." *Id.*  It is not the case, however, "that defense expenses can never be awarded in an action involving a false registration." *Blue Bell, Inc. v. Jaymar-Ruby, Inc.*, 497 F.2d 433, 439 (2d Cir. 1974).  Rather, the award of damages may be appropriate in "a case where an absolutely false registration was fraudulently obtained solely for the purpose of instituting completely vexatious litigation." *Id.*; *see also Havana Club Holding, S.A. v. Galleon*, No. 96-CV-9655, 1998 WL 150983, at *2 (S.D.N.Y. Mar. 31, 1998) (explaining that the "defendants ha[d] failed to plead any facts which, if proved, could demonstrate that [the plaintiff's] 'renewal' of the mark . . . was solely intended to facilitate meritless litigation," and, therefore, the defendants had "failed to state a claim for § 1120 attorney's fees under the narrow exception left open in *Blue Bell*").

ii.  Application

In its application to the USPTO, NWS represented the Mark had been in use in commerce at least as of June 21, 2007.[30]  Defendant argues that the statement is false, as evidenced by the lack of dated documentation supporting NWS's application to the USPTO and the timing of NWS's registration of the Mark—three years after the Mark was allegedly first "in use" in commerce and four hours after NWS contacted Defendant about a price quote for the Domain Name.  There is, however, at the very least, an issue of material fact as to whether this statement is fraudulent.  Neal testified that the Mark was in use in commerce beginning in 2004 when the d/b/a entity was established.  Although the Court refused to allow NWS to defeat NameMedia's Motion by proffering Neal's testimony, and only this testimony, as evidence that the Mark existed in 2005 because it was not corroborated by any other evidence in the record, as explained above, there is at least one other piece of dated evidence in the record to support Plaintiff's claim that the Mark was in use in 2007.  In particular, an invoice dated September 4, 2007 bears the name New World Solutions.  (Schwimmer Decl. I Ex. 15.)  Accordingly, Plaintiff has come forth with some evidence—albeit weak evidence—to support its claim that the Mark was in use in commerce in 2007, beyond Neal's testimony standing alone.  The Court cannot, therefore, conclude as a matter

---

[30] Plaintiff is correct that to state a claim for fraud, Defendant must meet Federal Rule of Civil Procedure 9(b)'s particularity requirement, which "requires that each allegedly fraudulent statement be identified with particularity, and that specific reference be made to the time, location, content[,] and speaker of each statement."  *See Great Lakes Mink Ass'n v. Furrari, Inc.*, No. 86-CV-6038, 1987 WL 33592, at *2 (S.D.N.Y. Dec. 21, 1987) (applying Rule 9(b) pleading standard to a claim pursuant to 15 U.S.C. § 1120).  Here, Defendant has made clear that the fraudulent statement at issue is NWS's representation to USPTO in its application for registration of the Mark that the Mark had been in use in commerce from at least June 21, 2007.  (Def.'s Summ. J. Mem. 20.)

of law that the statement that the Mark was in use in commerce in 2007 was fraudulent and, accordingly, that the Mark is invalid and unenforceable.  *Cf. Orient Exp. Trading Co. v. Federated Dep't Stores, Inc.*, No. 84-CV-5964, 1988 WL 3385, at *13–15 (S.D.N.Y. Jan. 8, 1988) (holding that the plaintiffs' trademark registrations were invalid and unenforceable because the evidence showed, among other things that the plaintiffs were "aware that they had not used the [mark] as of [the date they represented] and had not used it in interstate commerce," but nonetheless and "with full knowledge that they had not used the [relevant] words," filed applications to register the mark), *aff'd*, 842 F.2d 650 (2d Cir. 1988).

Furthermore, there are material issues of fact as to whether Plaintiff's omission that Defendant had the Domain Name was material.  It is clear that "[t]he existence of another person claiming a right to the service mark at the time of [the defendant's] . . . application, . . . would indeed have been material to the determination to grant the application."  *Baker v. Parris*, 777 F. Supp. 299, 305 (S.D.N.Y. 1991) (emphasis and internal quotation marks omitted); *cf. Buti*, 935 F. Supp. at 474 (explaining plaintiff's omission of the fact that the movant used the mark in Milan was not an omission that was "material" because use of the mark in foreign commerce would not led the USPTO to deny the trademark registration).  This is not, however, a case where Plaintiff knew of Defendant's use of the Mark in U.S. commerce.  Instead, Plaintiff failed to disclose that Defendant registered the Domain Name.  It is at least unclear, then, that the omission was material to the determination to grant the application.  Accordingly, disputes of material fact prevent the Court from granting the Parties' Cross-Motions for Summary Judgment on whether a cancellation of the Mark Registration and damages are warranted under 15 U.S.C. §§ 1119 and 1120, and, therefore, these Motions are denied.

b. Exceptionality

Finally, NameMedia argues that this case should be deemed "exceptional" pursuant to 15 U.S.C. § 1117(a) —and NameMedia should accordingly be awarded attorneys' fees—because "the futility of Plaintiff's case was brought to . . . Coyne's attention prior to bringing the [A]ction" and because of the "bad faith manner in which [the Action] was maintained." (Def.'s Summ. J. Mem. 21.)

i.  Applicable Law

The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The Second Circuit has interpreted "exceptional cases" to include cases involving "fraud or bad faith," which, in turn, includes "fraudulent conduct in the course of conducting trademark litigation." *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 221–22 (2d Cir. 2003) (internal quotation marks omitted); *see also Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 111 (2d Cir. 2012) (explaining that attorney fees are allowable under § 1117(a) on evidence of fraud or bad faith and that "the key is willfulness on the part of the defendants").

ii.  Application

To begin, it is unclear whether NameMedia presses the claim that the case is exceptional, at least at this time. NameMedia's memorandum filed in support of its Motion for Summary Judgment states that "[g]iven the sheer volume of Plaintiff's vexatious behavior," NameMedia "requests the opportunity to brief the exceptionality issue separately [following a status conference on May 28, 2013]," and makes clear that it is only seeking summary judgment dismissing all of Plaintiff's claims, "as this entire case is based on Plaintiff's misstatements."

(Def.'s Summ. J. Mem. 22 & n.20.)  At the May 28, 2013 conference, the Court granted Coyne's

motion to withdraw as counsel for NWS, (May 28, 2013 Hr'g Tr. 40–42), and although Defendant

stated its intention to "file for Rule 11" against Coyne, (*id.* 37), it did not raise the issue of

"exceptionality" or request permission to separately brief the issue.  However, NameMedia

further briefed the issue in its Memorandum in Opposition to Plaintiff's Cross-Motion for

Summary Judgment and in Further Support of Defendant's Motion for Summary Judgment.  (*See*

Def.'s Summ. J. Reply 14–15.)  In particular, NameMedia argues that NWS's "bad faith" pursuit

of the lawsuit can be inferred from (1) the fact that NWS "was in possession of no evidence that

Plaintiff made use of the Mark prior to March 2005" and yet prosecuted this Action

"knowing . . . [it] had to demonstrate trademark priority as of March 2005 to prevail on its

claims" and (2) that Neal testified that NWS commenced the Action because it expected

NameMedia to give the Domain Name to Plaintiff.  (Def.'s Summ. J. Reply 15, *see also* Neal Tr.

295–296 ("[W]e actually felt that upon the service of the initial Summons and Complaint that

they would simply give it to us, that they would cover our costs and give it to us.").)  NWS does

not address the issue.

      The Court agrees with NameMedia that there is, at the very least, circumstantial evidence

of bad faith here.  To begin, NameMedia's statement that bad faith can be inferred from the fact

that NWS "was in possession of no evidence that Plaintiff made use of the Mark prior to March

2005" and yet prosecuted this Action "knowing . . . [it] had to demonstrate trademark priority as

of March 2005 to prevail on its claims," (Def.'s Summ. J. Reply 15), is not entirely accurate.  As

discussed above, the relevant inquiry as to Plaintiff's trademark claims is not whether or not there

was a valid trademark at the time of the infringing conduct, but rather, whether the mark was in

use.  Nevertheless, Defendant correctly points out that Plaintiff had no evidence that it had made use of the Mark prior to Defendant's registration of the Domain Name, and yet chose to instigate the Action.  This supports a finding of bad faith.  Further, the undisputed facts that Plaintiff knew of the Domain Name in 2007, waited until 2010 to contact Defendant, asked for a price quote, and, when it received the price quote, instead of responding to Defendant, filed an application to the USPTO four hours later are at least suggestive of a bad faith motive in instigating this litigation.  Finally, NWS's conduct in this Action supports an inference of bad faith, as discussed in detail above.  Plaintiff did not produce Coyne for a deposition, did not depose several witnesses Defendant identified as relevant, choosing, instead, to rely on unsubstantiated and unqualified claims by Neal, and proffered evidence that was responsive to Defendant's discovery demands for the first time in connection with its Motion for Summary Judgment.[31]

Nevertheless, even though there is circumstantial evidence of bad faith, there is no direct evidence of bad faith, and, in the absence of direct evidence, the Court does not deem that this case is "exceptional" within the meaning of 15 U.S.C. § 1117(a).  *See Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 254 (S.D.N.Y. 2004) ("Although the court concludes that defendants acted in bad faith, the court is not prepared to term this case 'exceptional,' and therefore this aspect of plaintiffs' requested relief will not be granted."); *cf. Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425, 444 (S.D.N.Y. 2002) (finding the case exceptional where the defendant "asserted claims and defenses without any reasonable basis in fact or law and . . . attempted to support such claims and defenses with items of evidence that

---

[31] There also is the matter of Coyne's suspect conduct as counsel in this case, before he withdrew.  That conduct will be addressed in another forum.

have been created or altered for purposes of [the] litigation"), *aff'd*, 81 F. App'x 396 (2d Cir.

2003); *Ptak Bros. Jewelry, Inc. v. Ptak*, No. 06-CV-13732, 2009 WL 1514469, at \*4 (S.D.N.Y.

June 1, 2009) (deeming the case exceptional where the "defendants in bad faith created multiple

difficulties in the litigation, including moving to file patently frivolous defenses and

counterclaims, claiming to be represented by counsel when the representation was a sham, and

making misrepresentations to the [c]ourt"), *motion to vacate denied by* 2011 WL 253424

(S.D.N.Y. Jan. 25, 2011).

### III. Conclusion

For the reasons stated herein, NameMedia's Motion to Strike is granted in part and denied

in part, NWS's Motion to Strike is granted in part and denied in part, NameMedia's Motion for

Summary Judgment is granted with respect to NWS's claims and denied with respect to

NameMedia's counterclaims, NWS's Motion for Summary Judgment is denied, and

NameMedia's request for a declaration that this case is "exceptional" pursuant to the Lanham Act

15 U.S.C. § 1117 is denied. The Clerk of Court is respectfully directed to terminate the pending

Motions.

SO ORDERED.

Dated:        White Plains, New York
              December 15, 2015

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE